## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | |
| **NORAM RESOURCES, INC. and** | § | **Case No. 08-38222-H1-7** |
| **AUSAM ENERGY CORPORATION,** | § | **(Chapter 7)** |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |
| **WILLIAM G. WEST,** | § | |
| **CHAPTER 7 TRUSTEE** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Adversary No. 10-_____** |
| | § | |
| **WRH ENERGY PARTNERS, L.L.C.,** | § | |
| **HUFF ENERGY FUND, L.P.,** | § | |
| **W.H. AVE., LLC, and BARRY BORAK,** | § | |
| | § | |
| **Defendants.** | § | |

## TRUSTEE'S ORIGINAL COMPLAINT AND
## OBJECTION TO CLAIM OF THE HUFF ENERGY FUND L.P.

William G. West, chapter 7 trustee for Noram Resources, Inc. ("Noram") and Ausam

Energy Corp. ("Ausam") files this Original Complaint and Objection to Claim against The Huff

Energy Fund, L.P.

### Summary of the Complaint

1. The Trustee seeks monetary damages against all Defendants arising out of their pre-

and post-petition wrongful conduct against the debtors and their estates. The Trustee also seeks the

equitable subordination/disallowance of The Huff Energy Fund, L.P.'s proofs of claim in this

bankruptcy case and a money judgment for the value of all property received by Huff in this

bankruptcy case on account of such claims. The Trustee also seeks exemplary damages, attorney's

fees and costs as allowed by applicable law.

## Jurisdiction and Venue

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Relief is sought pursuant to 11 U.S.C. §§ 105, 502, 510, Bankruptcy Rule 3008 and other applicable law. This adversary is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## Parties

4.     The Trustee may be served in this adversary through the undersigned counsel.

5.     WRH Energy Partners L.L.C. is a Delaware limited liability company and general partner of The Huff Energy Fund L.P. WRH Energy Partners L.L.C. may be served with this complaint and a summons through its registered agent for service of process, Corporation Service Co., 2711 Centerville Rd., Suite 400, Wilmington, DE 19808. WRH Energy Partners L.L.C. will also be served with the complaint and a summons at its place of business located at 1776 On the Green, 67 Park Place, Morristown, NJ 07960.

6.     The Huff Energy Fund L.P. is a Delaware limited partnership and a creditor in this case. The Huff Energy Fund L.P. may be served with this complaint and a summons through its registered agent for service of process, Corporation Service Co., 2711 Centerville Rd., Suite 400, Wilmington, DE 19808. The Huff Energy Fund L.P. will also be served with the complaint and a summons at its place of business located at 1776 On the Green, 67 Park Place, Morristown, NJ 07960.

7.     W.H. Ave. L.L.C. is a Delaware limited liability company and the assignee of estate assets from The Huff Energy Fund L.P. W.H. Ave. L.L.C. may be served with this complaint and a summons through its registered agent for service of process, Corporation

Service Co., 2711 Centerville Rd., Suite 400, Wilmington, DE 19808. W.H. Ave. L.L.C. will also be served with the complaint and a summons at its place of business located at 1776 On the Green, 67 Park Place, Morristown, NJ 07960. WRH Energy Partners L.L.C., The Huff Energy Fund, L.P., and W.H. Ave. L.L.C. are collectively referred to herein as "Huff."

8.     Defendant Barry Borak is an individual and a former director of the Debtors. Mr. Borak will be served with this complaint and a summons at 64 Devonshire Rd., Waban, MA 02468.

### Relevant Background

**Ausam and Noram purchase the oil and gas Properties from SKH**

9.     On or about September 21, 2006, SKH Management L.P., SKH Management II, L.P., SKH Management III, L.L.C., SKH Energy Fund, L.P., and Antares Exploration Fund, L.P. (collectively "SKH") and Ausam executed an Asset Purchase Agreement (the "APA") under which SKH agreed to convey to Ausam all of SKH's rights, title and interests in numerous oil and gas leases (the "Properties"). Under the APA, Ausam would assign all of its interests in the Properties to Noram; SKH would then transfer title to the assets directly to Noram.

10.     SKH and Ausam and Noram closed on the APA through a series of conveyances beginning on or about January 27, 2007 and concluding on or about July 30, 2008. Ausam paid SKH consideration of approximately US $13.5 million cash, plus 63,417,143 common shares in Ausam, for the Properties. At the time of the transaction, the value of one common share of Ausam was deemed to be CAD $0.35 per share. If one assumes an approximate exchange rate in this time frame of US $0.85 = CAD $1.00, then Ausam paid SKH consideration of about US $13.5 million cash in, plus common shares in Ausam with a deemed value of approximately US $18,866,600.

**The Properties are pledged as security for a $25 million secured Debenture that Ausam and Noram issue to Huff**

11.     On July 5, 2007, approximately six (6) months after the closing conveyances on the APA with SKH first began, Ausam and Noram issued to Defendant Huff a US $25,000,000 9% Senior Secured Convertible Debenture, due five years later on July 3, 2012 (the "Debenture").    Barry Borak, a principal at Huff, was appointed to the board of Ausam and Noram pursuant to Huff's rights under Article 6.21 of the Debenture.   Though appointed by Huff, Borak, as a director, had the fiduciary duty and the duty of loyalty to act on behalf of Ausam and Noram.

12.     For approximately six (6) months prior to purchasing this Debenture, Huff conducted due diligence inquiring into Ausam's and Noram's business and commercial matters. This due diligence included (but was not limited to) Huff's examining the merits of Ausam's and Noram's purchase of the Properties from SKH under the APA.   Noram and Ausam cooperated fully in Huff's due diligence, and furnished to Huff all information that Huff requested from Ausam and Noram.

13.     As security for the Debenture, Noram and Ausam granted Huff a security interest, mortgage and pledge in all of the properties, rights, assets, and undertakings of every nature whatsoever and wherever situated that Noram and Ausam "may now be possessed of or entitled to or that it may at any time hereafter acquire … whether freehold, leasehold, or other" interest. The pledged security for the Debenture accordingly included all of Noram's rights, title and interests to the oil and gas leases included in the Properties that Noram purchased from SKH; Huff thereby obtained a foreclosable lien upon these oil and gas leases.

14.     The Debenture that Huff, Ausam and Noram executed on July 5, 2007, listed thirteen (13) circumstances constituting Events of Default.[1]  The occurrence of any of these Events of Default would allow Huff to accelerate, and demand immediate payment on, the principal and interest due under the Debenture.

15.     Though Huff subsequently stated that Ausam overpaid SKH for the oil and gas leases included in the Properties, *see* Doc. 137, of 7/28/09 at 3, Huff's public statements belie Huff's prior knowledge of the value of these oil and gas leases.  Huff knew at the time it subscribed to the US $25,000,000 9% Senior Secured Convertible Debenture that the Properties that Ausam purchased from SKH had a value more than sufficient to secure the Debenture.  Huff also knew that, with proper development and financing, the Properties would achieve a fair market value significantly greater than the total consideration Ausam paid for them.

### Ausam and Noram are successful in developing the Properties

16.     Confirming Huff's view that the Properties were quite valuable were Noram's successes in developing oil and gas leases included with the Properties.  Specifically, from June

---

[1] The conditions of default under paragraph 8.1 of the Debenture included: defaulting "in the payment of the principal of this Debenture," Debenture ¶ 8.1(a), defaulting "in payment of any interest due on this Debenture," *id.* ¶ 8.1(b), a decree or order of a court adjudging Noram or Ausam "bankrupt or insolvent," *id.* ¶ 8.1(c), Noram or Ausam instituting "proceedings to be adjudicated a bankrupt or insolvent," *id.* ¶ 8.1(d), Noram or Ausam failing to "pay any … indebtedness in an amount in excess of $500,000, or its equivalent … when due, in the ordinary course of business … or if any other default … relating to the indebtedness in an amount in excess of $500,000 shall occur … or such indebtedness in an amount in excess of $500,000 shall be declared due and payable … prior to the date of maturity," *id.* ¶ 8.1(e), if Noram or Ausam "shall fail to comply in all respects with applicable laws," *id.* ¶ 8.1(f), if any amendment were made to the terms, rights, privileges or conditions attaching to the common shares of Ausam which are materially adverse to the interests of Huff, *id.* ¶ 8.1(g), if amendment were made to the terms, rights, privileges or conditions attaching to any securities convertible into common shares of Ausam which were materially adverse to Huff, *id.* ¶ 8.1(h), if facilities or equipment owned by Noram or Ausam "are not operated … in compliance with all applicable laws," *id.* ¶ 8.1(i), if approvals, permits, certificates, licenses, etc. needed to own and operate Noram's or Ausam's business "are not … maintained in good standing," *id.* ¶ 8.1(j), a breach of "any other covenant … contained in this Debenture" for a period of thirty (30) days, *id.* ¶ 8.1(k), if any representation in favor of Huff contained in the Debenture Subscription Agreement shall be untrue and capable of being cured, but remains uncured for a period of thirty (30) days, *id.* 8.1(l), and if "writ, attachment, execution or similar process is levied" against the property of Noram or Ausam and not released within thirty (30) days after such levy, *id.* ¶ 8.7(m).

2007 to November 2008, Noram drilled four (4) wells and was planning to participate in a fifth well. Three (3) of the first four (4) wells that Noram drilled were successful, producing hydrocarbons in commercial quantities.[2] The Weathorford prospect RDH Farms #1 well, located in Liberty County, Texas, began commercial production on October 24, 2007 and had produced 530 MMcf of gas and 13,040 bbls of condensate through March 31, 2008. The Quatre prospect Fisher Lindsey #1 well, located in Calcasieu Parish, Louisiana entered production on May 2, 2008, and had produced about 230 MMcf of gas and 6,181 bbls of oil through June 30, 2008. The Nolte Marsh prospect # 1 well in Liberty County, Texas was drilled to a depth of 13,330 feet on or about September 18, 2008 and encountered an estimated 35 feet of net pay. Test results from the Nolte Marsh #1 well showed the well flowed at an initial rate of approximately 2.5 MMcf per day and 620 barrels of oil per day, or approximately 1,050 barrels oil equivalent per day, through a 10/64" choke.

17.     Based on production streams from these wells, Noram reasonably anticipated revenues of approximately $6 million per year for the calendar year 2009. Further, given the commercial success of the Nolte Marsh #1 well, Noram intended to drill a "sister" well in the North Constitution prospect in Jefferson County, Texas. Based on production rates for the Nolte Marsh well, as well as 3D seismic and offset well data, Noram reasonably anticipated that this sister well had the potential to boost Noram's revenues from an expected $6 million per year to somewhere between $8 million to $12 million per year.

18.     At the time of its success in drilling the wells, Noram's business plan concurrently contemplated a reduction in overhead and personnel, as was appropriate for drilling program like

---

[2] The Patch I well in Starr County, Texas was not commercially successful. This well reached a depth of 9,800 feet on or about July 2, 2007. Though hydrocarbons were present, logging and sidewall cores indicated that the well might not be commercial; the well was accordingly plugged and abandoned.

that the company was pursuing. Similarly – although its anticipated revenues would have more than sufficed to allow it to retain the acreage it had under lease – Noram also intended to reduce its acreage under lease by foregoing certain lease renewals. Ausam and Noram also intended to reduce Noram's capital requirements through various farm-out or other agreements, and to raise additional capital from investors as needed.

19.     In sum, production from the wells at the Wethorford, Quatre and Nolte Marsh prospects meant that Noram and Ausam would have revenues more than sufficient to meet their debt service, costs and other expenses, and were accordingly poised to enjoy financial success. The North Constitution well would have added to this success.

**Huff notices the Properties' commercial success and begins to look for ways to declare an Event of Default, so that Huff could accelerate the Debenture, force a liquidity crisis at Ausam and Noram, and obtain Noram's Properties for itself**

20.     The strong commercial showing of the wells that Noram drilled on the Properties, and the potential for greater commercial success from additional development of the oil and gas leases, did not go unnoticed by Huff. Consequently, sometime in or near mid-2008, Huff began to look for ways to use its position as a senior secured creditor of Noram and Ausam to obtain exclusive ownership of Noram's interests in the Properties at a below-market cost – to the exclusion and detriment of Ausam, Noram, the equity holders in these companies, and ultimately, to the detriment of other creditors of these companies. As a Huff employee and/or principal, Borak was privy to Huff's plans and knew of Huff's true intentions. Borak violated his fiduciary duty to the debtors by failing to disclose Huff's true intentions.

21.     In particular, Huff began scrutinizing Noram's/Ausam's business conduct in an effort to identify circumstances constituting one or more of the many Events of Default defined in paragraph 8.1 of the Debenture. Huff knew that, if it could identify an Event of Default on the

part of Noram or Ausam, Huff could accelerate and declare immediately due and payable the principal and interest on the Debenture. *See* Debenture ¶ 8.1 (in Event of Default, the "Holder may … declare the Principal Amount and Interest … to be due and payable and the same shall forthwith become immediately due and payable to the Holder … ."). Huff also knew that -- if it could accelerate the total amount of principal and interest due on the US $25,000,000 9% Debenture -- Noram and/or Ausam would lack the liquidity needed to immediately pay off all amounts due under the Debenture and concurrently continue their business operations, and so would be forced into insolvency. Huff could then foreclose on the security provided under the Debenture, *see id.* ¶¶ 3.1, 8.1, or otherwise use its secured position to obtain exclusive ownership of Noram's interests in the Properties.

### To Huff's frustration, Ausam and Noram prove financially sound; Huff then begins to devise its own plan to force an Event of Default

22.     To Huff's disappointment, after issuing the July 5, 2007 Debenture, Noram and Ausam demonstrated financial well-being. Up to June 2008, these entities were able to pay accounts payable and trade accounts in a timely manner and/or on bases acceptable and/or customary in the oil and gas industry, to make payroll, and to otherwise meet current liabilities as they fell due. No Events of Default occurred or were declared by Huff.

23.     Frustrated by Ausam's and Noram's successful management of their business and development of the oil and gas leases included in the Properties, Huff began in the summer of 2008 to formulate its own plan to force an Event of Default, and to create grounds for accelerating the indebtedness on the Debenture. Huff's aim was to cause a liquidity crisis at Ausam and Noram, force the companies into insolvency and then foreclose on the Properties, or otherwise use its secured position to gain exclusive ownership of Noram's interest in the Properties.

24.     Ironically, it was Noram's and Ausam's plans for developing the Properties that played into the hands of Huff's scheme. In particular, Noram and Ausam sought capital to fund a drilling program directed at prospects included in the Properties. Huff knew as early as March, 2008 that, as a result of Noram's desire to further explore and develop the oil and gas leases included among the Properties, and to gain additional capital for potential acquisitions, Noram and Ausam had started to plan additional capital raises, including a private placement of equity, an early exercise of warrants, and a subordinated debt issue.

25.     Based on communications with Huff personnel, Noram and Ausam were aware that an issue could potentially arise with respect to the planned equity private placement, in that the Debenture contained negative covenants. Specifically, paragraph 6.23(i) of the Debenture specified that Ausam "will not issue Shares [in Ausam] at a price below the then Current Market Price, or fair market value (as determined by an investment bank agreed upon as between the Holder [Huff] and the Parent [Ausam]) if the shares are not listed for trading on a recognized stock exchange." Debenture ¶ 6.23(i). Based on the price at which Ausam and Noram planned to issue the equity, these companies were concerned that Huff might claim that the price was below the "Current Market Price, or fair market value" as specified in the Debenture. *See id.*, ¶ 6.23(i). If it were determined that Ausam had completed a private placement of equity at a price below that specified in the Debenture, Huff could argue that an Event of Default had occurred. *See id.* ¶ 8.1(k) (Event of Default occurs "if there shall be a breach by the Corporation of any other covenant or condition contained in this Debenture and any such breach continues for a period of thirty (30) days"). Likewise, there existed a concern that a portion of the private debt placement could be construed by Huff as violating a negative covenant of the Debenture. *See id.* ¶ 6.23(g) ("The Corporation will not enter into any transaction ... with SKH Management, L.P.

or its affiliates ... or any other party related to the Corporation having a monetary value greater than US $1,000,000 per annum ... .").

26.     Early on in its capital-raise process, Noram and Ausam thus faced a choice. These companies could obtain from Huff an assurance that Huff would approve of the private placement of equity and debt, and of the warrant early exercise program, and waive any rights (if such rights in fact existed) to assert that the equity and debt placement and warrant early exercise program constituted Events of Default under the Debenture. Alternatively, Noram and Ausam could pursue other available financing which could not arguably be construed by Huff as an Event of Default under the Debenture.

27.     Accordingly, Noram and Ausam approached Huff in or near July 2008, and inquired as to whether Huff would interpret the planned financings as an Event of Default under the Debenture.  Huff repeatedly assured Ausam and Noram that it would not interpret the planned capital raises as any type of Event of Default under the Debenture.  But, as Noram and Ausam would later learn, Huff's assurances were completely false – a ruse and a trick designed, first, to get other unsecured creditors to make loans to the companies for Huff's benefit, and second, to declare an Event of Default, so that Huff could gain exclusive ownership of Noram's and Ausam's interest in the Properties.

**Huff falsely assures Ausam and Noram that Huff will approve the equity placement, and waive any right it may have to declare the placement an Event of Default under the Debenture**

28.     When Noram and Ausam approached Huff about its interpretation of the Debenture's covenants, Huff saw its opportunity to lure Noram and Ausam away from alternative sources of financing, and to also lure these companies into circumstances where Huff could declare an Event of Default.  Huff could then move closer to its goal of creating liquidity

problems for the companies, forcing Ausam and Noram into insolvency, and foreclosing its lien on the Properties, or otherwise using its secured position to gain Noram's and Ausam's interests in the Properties for its exclusive use.

29.     To implement this "string-along" plan, authorized representatives of The Huff Energy Fund L.P. repeatedly assured Noram and Ausam that Huff would approve of Ausam's planned financings, *e.g.,* the private placement of equity and debt, and waive any right to declare that an Event of Default under the Debenture had been caused by the capital raises. Some non-exclusive examples of these representatives' specific and knowingly false assurances follow:

- On a June 2008 afternoon, Ed Dartley, who was appointed by Huff to be Huff's observer of Ausam's and Noram's board of directors, spoke by telephone to Ausam CEO Mark Avery. At the time of this conversation, Dartley was in Huff's office at 67 Park Place, Morristown, NJ 07960, and Avery was in Noram's office at 13103 FM 1960 West, Suite 210, Houston, Texas 77065. Dartley then told Avery that Ausam and Noram could "take our [*i.e.* Huff's] non-response as an approval" by Huff of the planned private equity financing, and a waiver of any right under the Debenture to assert that the equity placement constituted an Event of Default. (Alternatively, Dartley employed words to this same meaning and effect).

- On or about October 7, 2008, Huff senior partner Bryan Bloom participated by telephone in a morning meeting of the board of Ausam. At the time of this board meeting, Bloom was in the Huff office at 67 Park Place, Morristown, NJ 07960. Avery and Ausam board members Richard Lummis and William Hitchcock were present at Ausam's offices at 13103 FM 1960 West, Suite 210, Houston, Texas 77065 at the time and they also participated in the meeting. Ausam board members Robert Eriksson, Alastair Robertson and Barry Borak also participated in the Board meeting by telephone. On information and belief, Ausam asserts that its transactional lawyer, Michael Der, of the firm of Bennett Jones, 4500 Bankers Hall East, 855 2nd St. S.W., Calgary, Alberta T2P 4K7, also listened to the board meeting by telephone. At this meeting, Bloom orally advised Avery and other Ausam personnel that Huff would act as a "friendly banker" to Ausam and Noram. Bloom further advised that Ausam should submit a "waiver request" for the debt placement, equity private placement and early warrant exercise. Bloom stated that Ausam would be required to pay a nominal fee, Huff would approve of the planned financings, and then "we will carry on" business as usual because it was "in our [*i.e.* Huff's] interest that you [*i.e.* Ausam] succeed." (Alternatively, Bloom used words to this same meaning and effect.) Avery, Lummis, Hitchcock, Borak and others heard Bloom make these statements.

Huff understood that Ausam and Noram intended to and would be able to complete all the planned financings within approximately five to seven months of June, 2008. As understood by Ausam and Noram, Huff's promise to approve of the financings, and to waive any right to declare that an Event of Default under the Debenture had been caused by these capital raises, would be fulfilled when the financings were complete, and Huff had voiced no objection.

30.     Unfortunately, at the time Huff's principals, partners, directors or other authorized personnel gave assurances to Noram and Ausam that it approved of the financings and would waive any rights existing under the Debenture to construe the planned financings as an Events of Default, Huff and Borak both knew that the representations were false. Huff falsely stated both its then-existing state of mind and its future intentions. Huff did so because it and Borak wished to dissuade Noram and Ausam from pursuing other means of raising capital available to further the companies' business operations and develop oil and gas leases included in the Properties. Huff intended for Noram and Ausam to rely on its false representations, so that these companies would then proceed with the planned subordinated debt placement in coordination with an early exercise of warrants and simultaneous private equity placement, and forego other means of financing. Huff and Borak knew that Huff would later declare that the financings were Events of Default under the Debenture allowing acceleration of Noram's and Ausam's obligations to pay interest and principal under the Debenture. Huff could then complete its plan to force the companies into insolvency and/or bankruptcy, so that Huff could use its lien to gain ownership of the companies' interest in the Properties, not only to the detriment of Ausam and Noram, but also to the detriment of these companies' other creditors.

31.     As a Huff principal and/or employee, Borak was "in on" and privy to Huff's plans. Borak was fully aware that Huff's assurances were false when made, and that Huff

intended for Ausam to rely on the false representations. Despite his fiduciary obligations—including the duties of candor, good-faith, full-disclosure and loyalty to Ausam and Noram—Borak did not communicate the truth to the debtors. Instead, abandoning his duties to Ausam and Noram, Borak sought to use his position as an Ausam/Noram director to advance Huff's plan, expecting that if Huff succeeded in the scheme, Borak would benefit financially in his role as a principal and/or employee at Huff.

32.     In reliance upon Huff's knowingly false assurances, Ausam and Noram proceeded with the debt placement and equity private placement. Also, in reliance on Huff's false assurances—which Ausam board member William Hitchcock heard and which Ausam justifiably communicated to Mooney Enterprises LLC ("Mooney")—Hitchcock and Mooney each made $1,000,000 loans to Ausam on or about October 7, 2008. These loans were unsecured and subordinated to the Debenture. Prior to the time Hitchcock and Mooney made these $1,000,000 loans, Huff was aware of the terms for the loans, was aware that Hitchcock and Mooney would make the loans, and was aware that Hitchcock and Mooney were relying upon, *inter alia,* Huff's June and October 2008 false assurances in making the loans. Huff was also aware that Ausam would use the vast majority of the loan proceeds for Huff's benefit by funding a lease extension that protected Huff's collateral position in Noram's Iola Prospect. Further, Huff was also then fully aware that the loans were to be extinguished prior to year end 2008 through conversion into the early exercise of warrants program, whereby the loan amount would be used to exercise warrants held by Hitchcock and Mooney.

33.     In October 2008, however, at the time Hitchcock and Mooney made these loans, Huff voiced absolutely no concerns. Essentially, Huff and Borak sat back and watched as the two creditors made loans totaling $2 million to Ausam, knowing that after these loans were

made, Huff would then seize upon the loans to argue that an Event of Default had occurred. Huff's declaring the Event of Default would then force Ausam and Noram into insolvency. Huff also understood that declaring an Event of Default would cause Hitchcock and Mooney, as unsecured creditors, to lose the money they had loaned to the company. Huff and Borak kept quiet, however. Huff wanted Hitchcock and Mooney to make the loans to Ausam because it knew that Ausam would use the funds to protect Huff's interest.

34.     Noram's and Ausam's counsel at Bennett Jones found Huff's oral assurances so sufficient that counsel advised Noram and Ausam that Bennett Jones would release the funds raised with the private placement of equity for the companies' use, and that the companies could close on the private debt issue.

35.     As time would show, Huff's knowingly false assurances, and Borak's knowledge of, complicity in and failure to disclose same, had fooled Ausam, Noram, their board members and their creditors. Huff and Borak fooled Ausam, Noram, their board members and unsecured creditors with the fraudulent representations described above and with numerous other misrepresentations—including negligent mis-representations and negligent failures to disclose when there was a duty to speak—that continued through late 2008.

**After the debt and equity private placements had already issued, Huff conditions its promised approval of the financing and waiver of any right to declare an Event of Default on Ausam's and Noram's acceptance of onerous and pre-textual demands**

36.     Having strung Ausam and Noram along from no later than June 2008 through November 2008, Huff now showed its true colors. Continuing a pattern of deceptive behavior, Huff wrote to Ausam and Noram on or about November 28, 2008, declaring for the first time that the on-going and completed financings were Events of Default under the Debenture. Huff stated it would only waive Events of Default under the Debenture if Ausam and Noram

consented to the onerous and unachievable terms of a purported Forbearance Agreement that Huff proposed. Incredibly, Huff's November 28 letter imposed a deadline of less than two weeks for Noram and Ausam to comply with <u>all</u> the onerous conditions set out in the letter. [3]

37. Among the demands by Huff for the Forbearance Agreement were requirements that:

- Noram and Ausam stipulate that they would never assert that Events of Default under the Debenture had not occurred;

- Noram and Ausam would close on at least another $2 million in equity financing through a warrant early exercise program;

- Noram and Ausam would escrow $300,000 of the $2 million equity raised as collateral for the Debenture;

---

[3] Consistent with Huff's prior conduct, the November 28, 2008 letter contains statements that were demonstrably false. For example, the letter stated, that in February 2008, Huff first learned of significant title defects for the oil and gas Properties that Ausam/Noram purchased from SKH which Ausam had discovered beginning in mid-2007. The letter continued that such matters required immediate notification to Huff under the terms of the Debenture. As Huff knew, however, SKH and Ausam/Noram had closed on the purchase of these Properties with conveyances that began on or about January 27, 2007. Prior to Ausam's/Noram's issuing the July 3, 2007 Debenture to Huff, Ausam and Noram allowed Huff complete access to all due diligence Huff requested -- including specifically the due diligence that Ausam/Noram had performed before purchasing the SKH Properties. Ausam's and Noram's due diligence for these Properties showed that approximately 90% of the acreage in the Properties had no title or lease issues or defects, or like problems.

In February 2008, *i.e.*, approximately seven (7) months after Huff had completed its due diligence for the Debenture, Huff employee Richard D'Angelo participated in a telephone conference with Ausam personnel including Mark Avery. At the time of this conversation, Avery was in Ausam's office at 13103 FM 1960 West, Suite 210, Houston, Texas 77065 and D'Angelo was in Huff's office at 67 Park Place, Morristown, New Jersey 07960. In this conversation, Avery stated that Ausam understood that approximately 90% of the acreage included in the SKH Properties had no title or lease issues or defects. D'Angelo responded that Huff "found the same thing" as part of performing its 2007 due diligence in deciding whether to lend the $25 million to Ausam and Noram.

In other words, Huff did not "first learn" of the title defects and issues in February 2008. Rather, Huff admittedly was aware of these issues no later than July 3, 2007 – when Huff completed its due diligence for the Debenture.

This awareness is simply one example of the pre-textual nature of Huff's November 28, 2008 letter.

- Ausam would pay Huff a consent fee of $150,000, and issue 300,000 warrants on the same terms as warrants earlier issued to William Hitchcock, chairman of Ausam, in connection with $1 million loan that Hitchcock made to Ausam;

- Noram and Ausam would use claims they purportedly possessed against SKH (which sold Noram the Properties per the APA) to renegotiate SKH's agreement with Noram and Ausam so as to extend Noram's time period to market and drill the prospects subject to reversion to SKH to a date no earlier than July 4, 2012; Ausam would then provide Huff with an executed agreement with SKH in a form acceptable to Huff no later than December 11, 2008; and

- By December 3, 2008, Noram and Ausam would amend the terms of Huff's existing warrants to purchase additional equity in Noram and Ausam to extend the expiration of such warrants to December 3, 2013 and to adjust the strike price to $0.1984 per warrant share.

38.    Provided that these and other conditions were met by December 11, 2008 -- *i.e.,*

less than two weeks later – Huff stated, the Forbearance Agreement would take effect. Huff and

Borak knew at the time it proposed these onerous terms that Ausam and Noram could not accept

them, both because the terms were impossible to achieve in such a short time and because the

companies' management would recognize such terms were irresponsible toward the companies'

welfare and toward the shareholders and/or other stakeholders. Huff and Borak knew at the time

that it made the demands asserted in the letter that a prudently-managed, comparable company

could not reasonably expect to satisfy such demands within the thirteen (13) day deadline set out

in Huff's letter.

39.    Not content to demand pre-textual, impossible terms for the Forbearance

Agreement, Huff's letter also specified that the proposed Agreement would only remain effective

for so long as certain on-going conditions were met. These continuing conditions included:

- Ausam and Noram would agree to pay the full face amount of the $25,000,000 Debenture, plus all accrued but unpaid interest and all other amounts outstanding on May 15, 2009 (*i.e.,* approximately five (5) months later) – instead of on the original July 3, 2012 Maturity Date (three and a half years later) as contemplated in the Debenture – plus an appropriate pre-payment premium acceptable to Huff;

- Ausam would provide Huff with a budget for 2009, and would be prohibited from spending amounts in excess of the budget without Huff's prior written approval; and

- Ausam would grant Huff the right to speak with employees or other representatives of Ausam as Huff deemed advisable in connection with Ausam's business, operations and prospects.

40.     As with the other demands and conditions that Huff made, these on-going conditions were pre-textual. Huff and Borak never intended for Ausam and Noram to accept them. Rather, Huff and Borak intended for these on-going conditions to be so onerous as to assure that Ausam and Noram would reject the terms for the proposed Forbearance Agreement and provide "cover" for their illicit scheme.

41.     Huff and Borak also knew at the time that it sent the November 28, 2008 letter to Noram and Ausam that the conditions were commercially unreasonable for the companies. Huff's purpose in demanding that Noram and Ausam satisfy the on-going conditions set out in the November 28, 2008 letter was simply to appear as if Huff were making an effort to adhere to its prior commitments to Noram and Ausam to waive any objection to, and to approve, the planned financings by Ausam and Noram -- only with a few "minor" adjustments.

42.     In reality, the demands and on-going conditions set out in Huff's November 28, 2008 letter were not minor adjustments to Bryan Bloom's October 2008 commitment to approve the planned financings, but simply require Noram and Ausam to pay a nominal fee or "penalty." Rather, both the demands and on-going conditions were designed and calculated by Huff to cause their rejection by Noram and Ausam, so that Huff could then seize upon the companies' rejection as a basis declaring that the private equity and debt placements and the early warrant exercise program were indeed Events of Default under the Debenture.

43.     On December 3, 2008, Noram and Ausam responded to Huff's letter noting, among other things, that:

- Noram and Ausam had been attempting to address the issues in the Debenture for months during which time Huff assured Noram and Ausam that Huff was accepting of the actions that Ausam and Noram were taking.

- Huff's board member representative on Ausam's board and one or more observers were present at Board meetings when the actions were discussed and the plans for Ausam's future were approved.

- Huff was fully aware of the loan complained of in Huff's November 28, 2008 letter (as well as another loan to the companies), and did not object to such loans because the funds from the loans were used to protect a collateral position held by Huff. Further, Ausam/Noram noted that Ausam would never have been able to obtain an advance of $2,000,000 from William Hitchcock and a company controlled by Stephen Mooney without Huff's representatives providing assurance to them that such advance would be consented by Huff. As Huff was aware, 80% of the monies provided by such an advance went to protect Huff collateral in the Iola Prospect.

- Huff was imposing unreasonable and unrealistic conditions in a forbearance agreement.

- The conditions relating to Huff's forbearance were not practical because the terms put Noram and Ausam at risk of foreclosure regardless of compliance to the conditions of the proposed agreement. These terms made it certain that Noram and Ausam would be in breach of one or more of such conditions if they went forward on the basis proposed by Huff.

44.    In summarizing Noram's and Ausam's concerns with Huff's November 28, 2008 demands and conditions, the companies noted that while they could agree to and attempt to cooperate with some of the demands and conditions, the companies could not "enter into agreements which are not practical ... and which unduly restrict Ausam's ability to operate ... ." Noram and Ausam offered in their response to meet with Huff to resolve differences in a way that would allow Huff to observe its prior commitment to approve the planned private equity placement and waive any Events of Default.

45.    Huff representatives met with Noram and Ausam personnel Mark Avery and Richard Lummis at Huff's New Jersey offices on or about December 9, 2008, and Huff advised the companies that a letter proposing a settlement of the parties' differences would arrive within two (2) weeks.

46.     The promised letter arrived on or about December 15, 2008, and starkly revealed what had been Huff's and Borak's true purpose all along – getting Ausam's/Noram's Properties for Huff. Huff's December 15 letter demanded that Ausam and Noram deed the most lucrative and promising of the Properties directly to Huff. Ausam and Noram, Huff proposed, would be left with the least promising of the Properties, but with Huff retaining its security interest in those lesser Properties and essentially taking the right to the vast majority of any profits Ausam/Noram earned from these lesser Properties. Huff knew which of the Properties were the most lucrative because Borak, while ostensibly serving as a director of Ausam/Noram and participating in the companies' management in that capacity, learned which Properties were most valuable and relayed that information to his principal and employer Huff. As a publicly traded company, Ausam could not accept Huff's proposal, given the plainly detrimental effect it would have on that company, Noram and the shareholders.

47.     Huff and Borak knew that Huff's deceptions and recalcitrance would impede Ausam's and Noram's planned warrant early exercise program because warrant-holders would suspect that Huff was intentionally seeking to impose unreasonable and unrealistic conditions on Ausam and Noram through the proposed forbearance agreement.   And in fact, Huff's misrepresentations and Borak's failures to disclose made execution of this program impossible. Otherwise, Ausam and Noram would have been able to raise approximately US \$2,000,000 and ultimately raise approximately US \$3,500,000 from this program.   Huff's and Borak's misconduct cost Ausam and Noram additional opportunities to raise capital and to pursue acquisitions, and damaged Ausam and Noram.

**Huff's misrepresentations and Borak's failures to disclose have the intended effect – confronted with Huff's impending acceleration of the Debenture, and anticipating the resulting liquidity crisis, Noram and Ausam file for Chapter 11 protection.**

48.     Confronted with the fact that Huff had reneged on its oral commitments, and had declared an Event of Default under the Debenture to accelerate the companies' indebtedness and foreclose on the oil and gas leases included in the Properties, Ausam and Noram faced the potential liquidity crisis that Huff had sought all along to create. From December 26 to December 30, 2008, Huff and Ausam/Noram engaged in discussions purportedly directed to addressing Huff's demands. Huff's participation in these discussions was again pre-textual; Huff had no intent of negotiating, proposing or agreeing to any settlement. In fact, as of December 30, 2008 – after Ausam/Noram had agreed to a range of Huff demands, Huff refused to even define the remaining Huff demands that Ausam/Noram should address. . Ausam's board then realized that, with no preliminary terms for a settlement with Huff as of December 30, 2008, Ausam and Noram should file for Chapter 11 protection. The companies were therefore forced to file voluntary Chapter 11 cases on or about December 30, 2008.

49.     On the petition date, the Debtors owed Huff approximately $28,563,651 under the Debenture. As noted, this indebtedness was secured by a lien on the oil and gas leases comprising the Properties. The misrepresentations that Huff perpetrated on Ausam and Noram, combined with this lien, allowed Huff to achieve the goal Huff had contemplated all along – foreclosing on the Properties or, alternatively, gaining exclusive ownership of Noram's interest in the Properties to the detriment of Debtors, their equity holders, and the Debtors' other creditors. On April 14, 2009, the Trustee filed a Motion to Sell substantially all operating assets of Ausam and Noram, including the oil and gas leases comprising the Properties, to Huff. *See* Doc. 92. Huff "credit bid" $12,500,000 of its secured claim, plus $200,000 cash for these assets. On May 11, 2009, the court entered an order granting the Motion to Sell. *See* Doc. 112. As part of this sale, Huff also took possession of paper and electronic records of Ausam and Noram.

50. Huff completed the "asset grab" it had been plotting for months. Had Huff not perpetrated its fraudulent scheme on Ausam and Noram, these companies would have remained on-going businesses. Ausam and Noram would have been able to timely pay their secured creditor and the unsecured creditors Hitckcock and Mooney (who would have converted their debt to equity through the early exercise of warrants), as well as providing a reasonable return on investment to Noram's and Ausam's equity holders.

51. Having succeeded in their plan, The Huff Energy L.P. and its general partner WRH Energy Partners L.L.C. assigned Huff's rights arising out of the sale to W.H. Ave. L.L.C., a special purpose entity that The Huff Energy Fund L.L.P. and WRH Energy Partners L.L.C. created for the express purpose of holding the assets wrongfully obtained from Ausam, Noram and/or these entities' estates in bankruptcy.

**Huff continues its wrongful conduct post-petition, harming the Debtors' estates.**

52. To Huff's dismay, its plan was not without problems. SKH appeared in the bankruptcy cases and asserted that the oil and gas leases had reverted and that it was now the owner of the Properties. Undeterred, Huff implemented a second scheme designed to deceive the Trustee, this Court and creditors in order to remedy the SKH problem. Huff sought and received from the Court authority to assert causes of action against SKH on behalf of the Debtors' estates. *See* Doc. 145. Huff undertook to act for the estates in bringing claims for breaches of clear title and other warranties that SKH made to Ausam and/or Noram in the APA as to the Properties. *See* Doc. 137. According to Huff, these title defects and other problems with the Properties meant that Ausam overpaid for the Properties, or did not receive reasonably equivalent value in return for payment for the Properties. *Id.* Further, Huff represented that its

filing suit against SKH was in the best interests of the Debtors' estates because Huff had identified "significant value that may yield substantial recovery for the . . . estates." *Id.*

53.    Huff thus undertook to act as a fiduciary to the bankruptcy estates in seeking redress for the **estates** against SKH on alleged breaches of the APA. Huff, however, had no such intentions. Instead, Huff used its authority to act for the estates to enter a settlement agreement with SKH which benefitted Huff. Huff then inaccurately advised the Trustee that the claims against SKH were not worth pursuing, and abandoned the estates' claims.

## Causes of Action

### Fraud and fraudulent inducement

54.    During the course of negotiations and/or business discussions with Noram and Ausam, Huff made numerous material misrepresentations in order to induce Noram and Ausam to proceed with the planned private placement of equity and debt, together with the early exercise warrant program. Among other things, Huff falsely represented that it would approve of the planned placements of equity and debt, together with the early exercise warrant program, and would not raise or declare that circumstances surrounding the planned financings constituted Events of Default under the Debenture. When it made these representations, Huff had no intention of adhering to its promises to approve of the planned placements of private equity and debt and the early exercise warrant program, or to waive any Events of Default that the placements arguably caused under the Debenture.

55.    Huff made these and other representations either knowing that they were false when made, or recklessly, as a positive assertion, and without knowledge of the representations' truth or falsity. Huff made these representations with the intent that Noram and Ausam rely on Huff's representations, and thereafter proceed with financings and capital raises that Noram and

Ausam had discussed with Huff. Noram and Ausam, in fact, relied on Huff's representations, and in fact did proceed with the equity private placement, and debt placement, foregoing other means of financing the companies' business and developing the oil and gas leases among the Properties.

56.     Noram and Ausam have been injured by Huff's fraudulent statements by reason of these companies' foregoing other avenues of financing available to further Ausam's and Noram's business objectives. Noram and Ausam have also been injured in that – contrary to its oral promises – Huff then seized upon the equity private placement and debt placement and early warrant exercise program as a purported Event of Default under the Debenture, and seized upon this Event of Default as a means to accelerate, or to threaten to accelerate and demand as immediately payable the principal and interest under the Debenture. As Huff intended, this acceleration caused a liquidity crisis at Ausam and Noram and forced the companies to file petitions in Chapter 11. Huff then effectively foreclosed upon the lien securing the oil and gas leases comprising the Properties by "credit bidding" on Noram's and Ausam's indebtedness to Huff to purchase those liens in Noram's and Ausam's bankruptcy proceeding. Huff wrongfully obtained, to the exclusion and detriment of Noram and Ausam and these companies' creditors and equity holders, substantially all of Noram's and Ausam's assets and interests in the Properties. The Trustee seeks a money judgment against Huff in an amount equal to the going-concern value of the debtors and their assets.

### Negligent misrepresentation

57.     Huff made representations about approval or waiver of circumstances arguably or purportedly constituting Events of Default under the Debenture in the course of its business or in a transaction in which Huff had a pecuniary interest. These representations included silence

when there was a duty to speak because, among other things, new information must be disclosed when that new information made Huff's earlier representations misleading or untrue. Huff's negligent misrepresentations were not limited to statements made in June 2008 or October 2008, but included misrepresentations made after these dates. Huff made these representations to Noram and Ausam for the guidance of these companies in their business. Huff did not exercise reasonable competence or care in obtaining or communicating the information. Noram and Ausam suffered pecuniary loss by justifiably relying on Huff's representations.

### Breach of fiduciary duty—Huff

58.     Huff agreed to investigate and pursue, on behalf of the estates, claims against SKH for breaches of the APA. Huff was a fiduciary to the estates and owed a duty to the estates to act in their best interests. Huff breached this duty. Among other things, Huff used its authority to act on behalf of the estates to negotiate a settlement or other agreement between SKH *and Huff*. This settlement benefitted -- not the Debtors' estates -- but Huff instead. Huff then inaccurately advised the Trustee that any estate claims against Huff were not worth pursuing, and caused the Trustees' claims against Huff not to be pursued. The Debtors' estates were injured and damaged because they lost the benefits that a faithful fiduciary and agent could have achieved in asserting claims against SKH on behalf of the Trustee and the estates. Any benefit realized by Huff in breaching its duty to the estates should be returned to the bankruptcy estates.

### Subordination of Huff's claims under 11 U.S.C. § 510(c)

59.     Under § 510(c), a court may subordinate a creditor's claims due to the creditor's inequitable conduct. Such inequitable conduct includes, but is not limited, to fraud, bad faith, wrongs or unfairness, unfair acts, a masquerading of something for what it is not and other

improper conduct. Huff engaged in inequitable conduct during these bankruptcy cases while acting in the capacity of a fiduciary to the bankruptcy estates. Huff's inequitable conduct resulted in injury to Debtors, other creditors and equity holders, and/or conferred an unfair advantage on the claimant Huff. Huff's claims should be subordinated.

60.     In addition, Huff's lien should be assigned to the estate pursuant to § 510(c)(2). As such the Trustee should be awarded a money judgment against Huff for all value received by Huff attributable to its status as a secured creditor. Alternatively, to the extent that such property is traceable, it should be returned to the estates.

### Disallowance of Huff's claims

61.     Huff's claims were obtained through trickery and deceit. Huff's claims should be disallowed in their entirety. Under 11 U.S.C. § 502 and Bankruptcy Rule 3008, the Court can reconsider an allowed claim for cause. As shown above, Huff engaged in misconduct toward Noram and Ausam, and its claims in these bankruptcy cases should be disallowed.

### Detrimental Reliance/Estoppel/Waiver/Bad Faith/Oppressive Conduct

62.     Huff promised that it would approve Ausam's and Noram's financings, including the private placement of equity, early warrant exercise program and private placement of debt. Huff was aware of certain rights to declare Events of Default under the Debenture. Huff also promised that it would waive existing rights to declare Event of Defaults under the Debenture which Huff believed could arise from the planned financings, and would approve these financings. These promises were made falsely and in bad faith. Huff made these promises with knowledge of its true, then-existing state of mind and future intentions. Huff made these promises when Noram and Ausam were without knowledge or means of obtaining knowledge of the true facts, and with the intent that the companies rely on Huff's promises.

63. Huff also engaged in the promises or in other conduct inconsistent with rights it may have possessed under the Debenture. Noram and Ausam relied to their detriment upon Huff's promises by, among other things, foregoing other available means and avenues to finance the companies' on-going business and exploration and development of the oil and gas leases in the Properties. These other means could not be construed as violations of covenants or Events of Default under the Debenture.

64. Huff was aware that Noram and Ausam would rely to their detriment upon Huff's promises, and intended for Noram and Ausam to rely on the promises.

65. Huff has waived, and is estopped from asserting, that its promise to approve the planned financings, or to waive any Event of Default under the Debenture that the planned financings of placement arguably caused, must have been in writing in order to be binding upon Huff.

### Breach of fiduciary duty/duty of loyalty and breach of duty of care—Borak

66. As a director, Borak owed Ausam/Noram the fiduciary duty to act honestly and in good faith with a view toward the best interests of these companies. Borak breached these duties. Borak was aware of Huff's scheme to dissuade Ausam/Noram from seeking alternative sources of financing by assuring Ausam that Huff would not construe the planned debt and equity capital raises and early warrant exercise program as Events of Default under the Debenture, so that Ausam would proceed with these financings. Because he was a principal and/or employee at Huff at the relevant times, Borak was privy to Huff's true intentions, and Borak knew that the Huff representations detailed above were false when made, that Huff knew they were false, and that Huff intended for Ausam to rely upon Huff's false representations. As a principal and/or employee at Huff, Borak was fully aware that, once Ausam/Noram proceeded

with the capital raises, Huff planned to declare that such financings were Events of Default under the Debenture, and to seize upon these purported defaults as a pretext for accelerating, and demanding as immediately due and payable, the principal and interest owed under the Debenture. As a principal and/or employee at Huff, Borak was also aware that Huff intended to use the declarations of default to foreclose on the lien, or otherwise use its position as a secured creditor to gain exclusive ownership and control of the Properties to the detriment of Ausam, Noram, and these companies' other creditors and equity holders.

67.    In violation of his fiduciary duty and duty of loyalty, including duities of honesty, good faith and disclosure/candor to Ausam/Noram, Borak did not disclose Huff's true intentions to Ausam, even though Borak was fully aware of those intentions and had a duty to speak. Borak subordinated his fiduciary duties to the interests of Huff and to his personal interests. Borak kept quiet because Borak intended for Huff to profit at Ausam's and Noram's expense. Borak expected to profit individually and personally in his capacity as a principal and/or employee at Huff by Huff's gaining ownership and control of the Properties to the exclusion and detriment of Ausam, Noram, these companies' other creditors, and equity holders. Borak expected that, once Huff completed its scheme, Huff would share the benefits of Huff's ill-gotten gains with Borak individually.

68.    Ausam and Noram were damaged as described above by Borak's breaches of fiduciary duty, including Borak's failures to disclose, in an amount of at least $31 million. Alternatively, as alleged above, Borak failed to act prudently and on a reasonably informed basis, and made poor and ill-considered business decisions as a director which cannot be defended under the business judgment rule. Though Borak was aware from communications with Huff personnel that Huff did not intend to waive Events of Default allegedly caused by the debt

and equity raises, and the early warrant exercise program, Borak negligently failed to communicate that intention to Ausam and Noram. Borak's ill-considered and/or negligent decisions included failing to advise Ausam and Noram of Huff's intentions when there was a duty to do so.

### Civil conspiracy, principal-agent vicarious liability

69.     Huff and Borak are separate persons or entities who decided on an object to be accomplished – namely, deceiving Ausam/Noram into believing that Huff would not assert that the debt and equity financings and warrant early exercise program constituted Events of Default under the Debenture. Huff and Borak, in his capacity as a director of Ausam and/or Noram, had a meeting of the minds as to their course of action. Huff and Borak understood that Huff would make false statements to Ausam/Noram, with the intent that Ausam/Noram rely on Huff's false statements, and that Borak, in disregard of his fiduciary duties to Noram/Ausam and with full awareness that Huff made the false statements knowingly, would not disclose such falsity to Ausam and/or Noram. Huff, in fact, knowingly made multiple false statements to Ausam and Noram. Borak knew that Huff's statements were false at the time that Huff made them to Ausam/Noram, and knew that Huff intended for Ausam/Noram to rely on the falsehoods. But, acting as Huff's agent instead of as Ausam's and Noram's fiduciary, Borak did not advise Ausam and Noram that Huff's statements were false, whether at the time made or at any later time sufficient to permit Ausam and Noram to avoid Huff's scheme. Huff and Borak thereby combined to damage Ausam and Noram.

70.     Huff as conspirator and principal is vicariously liable for the wrongful acts of its co-conspirator and agent Borak.

### Request for Pre- and Post-Judgment Interest and Attorney's Fees

71.     The Trustee seeks pre-judgment interest at the rate of 5% per annum. The Trustee seeks post-judgment interest on all money damages awarded hereunder from the date of judgment until paid at the prevailing federal judgment rate. The Trustee also requests an award of his reasonable attorney's fees to the extent allowed by law.

### Request for Exemplary Damages

72.     The abrogation of his duties by Borak and the actions of Huff were intentional and malicious and intended to cause harm to the debtors. The Trustee seeks the award of exemplary damages against the defendants in an amount of not less than three times the amount of monetary damages awarded and the value of all property wrongfully obtained by Huff.

### Prayer for Relief

For these reasons, the Trustee asks that the Debtors' estate recover a judgment against Huff and Borak awarding the following relief:

a.     Equitable subordination of Huff's claims allowed in the Noram and Ausam bankruptcy case and the assignment of all liens to the estate;

b.     A money judgment for the value of all property transferred to Huff on account of its secured claims or the return of all such property.

c.     Disallowance of Huff's claims in the Noram and Ausam bankruptcy case;

d.     Unwinding, reversion and/or voiding of any transactions that Huff procured in the Debtors' bankruptcy case by reason of Huff's fraud or wrongful conduct;

e.     An award of actual damages against Huff and Borak in an amount of at least $31 million;

f.     Exemplary damages;

g.     An award of fees and expenses associated with this action, including but not limited to reasonable attorneys' fees incurred and as allowed by law or in equity; and

h.     An award of interest and all costs incurred in connection with this matter;

Respectfully submitted,

STRAWN PICKENS L.L.P.

By:       /s/ John R. Strawn, Jr.
           John R. Strawn, Jr., #19374100
           Andrew L. Pickens, #15971900
           1001 Fannin Street, Suite 4665
           Houston, Texas 77001
           (713) 659-9600
           (713) 659-9601 (Fax)

**ATTORNEYS FOR TRUSTEE WILLIAM G. WEST**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all interested parties on this the 29th day of December 2010.

/s/ John R. Strawn, Jr.
John R. Strawn, Jr.