## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice was served the 3rd

day of February, 2009, via United States First Class mail, postage pre-paid on the persons and

entities listed below and, where available, via ECF notice.

/s/ Timothy A. Davidson II
Timothy A. Davidson II

David Jones
Chapter 7 Trustee
Porter and Hedges LLP
1000 Main Street, 36th Floor
Houston, TX 77002

-3-

# EXHIBIT 6

**PLAINTIFF'S FIRST REQUESTS FOR
PRODUCTION TO DEFENDANTS THE
HUFF ENERGY FUND, L.P.
AND BARRY BORAK**

# STRAWN PICKENS LLP

FIRST CITY TOWER
1001 FANNIN STREET, SUITE 4665
HOUSTON, TEXAS 77002
(713) 659-9600
FAX (713) 659-9601

WWW.STRAWNPICKENS.COM

June 28, 2011

***Via email and regular mail***

Mr. Robert W. Jones
Patton Boggs LLP
2000 McKinney, Suite 1700
Dallas, Texas 75201

       Re:   *Bankruptcy* Case No. 08-38222; In the United States Bankruptcy Court for the Southern District of Texas, Houston Division; *Adversary Proceeding No. 10-03703; In re Noram Resources, Inc. and Ausam Energy Corp., Debtors, William G. West, Trustee, Plaintiff v. WRH Energy Partners, LLC, Huff Energy Fund, LP, W.H. Ave., LLC, and Barry Borak,*

Dear Robert:

       It was good to see you at the hearing last week.

       I enclose for your records a copy of Huff's Motion for Authority to Assert Causes of Action on Behalf of the Debtors' Estates in Bankruptcy Case No. 08-38222 (Doc. 137), as well as the Order granting Huff's Motion (Doc. 145).

       As a result of the Court's granting Huff's Motion for Authority to Assert Causes of Action on Behalf of the Debtors' Estates, Huff became an agent and fiduciary of the Estates of Debtors Noram Resources, Inc. and Ausam Energy Corporation ("Ausam").

       As a fiduciary and agent of the Debtors' Estates for the purpose of asserting claims against SKH Management LP, SKH Management II LP, SKH Management III LLC, SKH Energy Fund LP, and Antares Exploration Fund LP (collectively "SKH"), Huff owed the Estates the duty to suborn its own interest to those of the Estates, the duties of scrupulous good faith, candor and transparency and the duty to act unselfishly. *See, e.g., In re Allied Gaming Mgmt., Inc.,* 209 B.R. 201, 203 (Bankr. W.D. La. 1997); *Mullen v. Jones (In re Jones),* 445 B.R. 677, 706 (Bankr. N.D. Tex. 2011); *Annesley v. Tricentrol Oil Trading, Inc.,* 841 S.W.2d 908, 910 (Tex. App.—Houston [14th Dist] 1992, writ denied). Among other things, Huff's fiduciary duties included "the general duty of full disclosure respecting

**EXHIBIT**

6

Robert W. Jones
June 28, 2011
Page 2

matters affecting the principal's interests ... ."  *United Teachers Assoc. Ins. Co. v. MacKeen & Bailey, Inc.*, 99 F.3d 645, 650 (5th Cir. 1996).

Pursuant to this duty of full disclosure[1] to the Estates, as well as the representations made in the Motion for Authority to Assert Claims, we request on behalf of the Trustee that Huff provide the Trustee with the following information:

- Any and all work product, analyses or reports on the status of investigations that Huff or its attorneys created after December 28, 2009 (the date of the Order), referring to, relating to or showing in any way Huff's reasons for determining that the pursuit of claims against SKH on behalf of the Debtor's Estates was no longer worthwhile, whether from Huff's perspective or the perspective of the Estates;

- Any communications or documents, including but not limited to letters, faxes, emails, memoranda or like documents, made between Huff and SKH after December 28, 2009, which refer to, relate to or show in any Huff's pursuit of "the Claims" as defined in Motion for Authority to Assert Causes of Action on Behalf of the Debtors' Estates, *see* Doc. 137, at 4; and

- Any agreement, contract or other understanding between SKH and Huff relating to or in any way showing terms for resolution and/or dismissal of the claims and/or counter-claims brought in *SKH Management, L.P., et al v. Huff Energy Fund LP and W.H. Ave., LLC,* Adversary No. 09-03165, (Bankruptcy case No. 08-38222), U.S. Bankruptcy Court Southern District of Texas.

As to the last of these items, the Trustee is willing to enter into a confidentiality agreement of the type customarily used in the Bankruptcy Courts for the Southern District of Texas for the protection of proprietary business information.

As to the first two items, no confidentiality agreement should necessary; the information included in these items should be viewed as belonging to the Estates.

---

[1]  This request is made pursuant to the duties of candor, transparency and full disclosure that a principal is owed by his agent, and is not made pursuant to, or dependent upon, the discovery obligations imposed upon litigants by, *e.g.,* Fed. R. Civ. P. 26, 34, etc. or like Bankruptcy Rules.

Robert W. Jones
June 28, 2011
Page 3

     Many thanks for your attention to this matter.  Please contact us if we can answer any questions.

Very truly yours,

Andrew L. Pickens
On behalf of William W. West, Chapter 7
Trustee

ALP:ssw
Enclosures

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 08-38222 |
| NORAM RESOURCES, INC., and | § | |
| | § | Chapter 7 |
| AUSAM ENERGY CORPORATION, | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |

## THE HUFF ENERGY FUND L.P.'S MOTION FOR AUTHORITY TO ASSERT CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 20 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Huff Energy Fund, L.P. ("Huff") files its Motion for Authority to Assert Causes of Action on Behalf of the Debtors' Estates (the "Motion"), and respectfully states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELEVANT BACKGROUND

### A.   SKH's Sells Deficient Oil and Gas Assets to Ausam

2. SKH Management, L.P. ("SKH Management"), SKH Management II, L.P. ("SKH II"), SKH Management III, L.L.C. ("SKH III"), SKH Energy Fund, L.P. ("SKH Fund"), and Antares Exploration Fund, L.P. ("Antares") (collectively "SKH") and Ausam Energy Corporation ("Ausam") executed an Asset Purchase Agreement dated September 21, 2006 ("APA"), under which SKH agreed to convey to Ausam all of SKH' rights, title and interests in and to certain oil and gas leases and certain associated personal property (together, the "Properties"). Under the APA, Ausam was allowed to assign its interest in the Properties to Noram Resources, Inc. ("Noram") and SKH would transfer title to the assets into the name of Noram directly.

3. Noram was (and still is) a wholly-owned subsidiary of Ausam.

4. On various dates between January 27, 2007 and July 30, 2008 (the "Closings"), SKH executed and delivered Conveyances to Noram conveying to Noram all of their rights, title, and interests to hundreds of oil and gas leases (the "Leases") identified in Exhibits A to the Conveyances. The Leases cover acreage over 16 development prospects (the "Prospects") in five states.

5. Article 4 of the APA contains certain representations and warranties of SKH in favor of Ausam related to the Properties. A copy of the APA is attached as Exhibit "A".

6.      Upon information and belief, SKH represented to Ausam that the Prospects were "ready to drill." After the Closings, it quickly became apparent that the Prospects had serious title defects and other problems and that they were far from drill ready.   There were numerous title defects related to the Properties and misrepresentations by SKH to the Debtors concerning the Properties (the "Title Defects").   As a result of the Title Defects, the Debtors' business plan was seriously impaired.      Subsequent to the Closings, the Debtors, upon discovering the Title Defects, directed their prepetition counsel, Bennett Jones LLP, to send a letter to SKH listing the affected Prospects and the associated Title Defects. *See* attached Exhibit "B." Huff believes that there may be additional Title Defects and problems with the Properties that are not listed on Exhibit A and Huff reserves its rights regarding any additional Title Defects or claims.

7.      Ausam paid SKH cash in the amount of $13,419,558 and 63,417,143 common shares in Ausam for the Properties (with the value of the common shares at the time of the transaction deemed to be CA $0.35 per share).   Upon information and belief, Ausam overpaid SKH for the Properties.      Accordingly, Ausam did not receive reasonably equivalent value in return for its payment of the purchase price for the Properties.   Upon information and belief, Ausam was insolvent, rendered insolvent, had unreasonably small capital and/or could not pay its debts as they became due as a result making payment of the purchase price to SKH.   Ausam and Noram had existing creditors at the time of the purchase of the Properties and have present creditors as of the Petition Date.

**B.      Ausam and Noram File Bankruptcy**

8.      Ausam and Noram (the "Debtors") filed voluntary chapter 11 cases on December 30, 2008 (the "Petition Date").   Ausam is the parent company of Noram.   The cases were jointly administered by order entered January 7, 2009.   The cases were converted to chapter 7 cases by

order entered February 26, 2009.  William West is the duly appointed chapter 7 trustee (the "Trustee") in each case.

9.      As of the Petition Date, Ausam and Noram were indebted to Huff in the amount of at least $29,172,859.07 (the "Huff Indebtedness").[1]  The Huff Indebtedness is secured by a lien on the Debtors' oil and gas assets as well as a blanket lien on all personalty owned by the Debtors.

10.     On April 14, 2009, the Trustee filed a motion seeking this Court's approval to sell substantially all of the Debtors' assets to Huff free and clear of liens, claims, interests and encumbrances under 11 U.S.C. § 363(f).  Huff "credit bid" $12,550,000 of its secured claim and paid $200,000 cash for the Debtors' assets.  On May 11, 2009, this Court entered an Order Granting Trustee's Sale Motion, approving sale of Debtors' assets to Huff free and clear of all liens, claims and encumbrances.

11.     Huff still has significant claims against the Debtors.  Huff requested that the Trustee consent to Huff filing suit on and prosecution of the estate causes of action against SKH (the "Claims").  The Trustee consented.

## RELIEF REQUESTED

12.     Pursuant to this Motion, Huff is seeking leave from this Court to file suit on and prosecute the Claims.

## AUTHORITY

13.     In *Louisiana World Exposition, Inc. v. Federal Ins., Co. (In re Louisiana World Exposition, Inc.)*, the Fifth Circuit held that a creditors' committee has standing to assert and prosecute actions on behalf of a debtor's estate.  832 F.2d 1391, 1397 (5th Cir. 1987).  The

---

[1]     Additionally, Huff purchased a secured claim against Noram from Square Mile Energy, LLC in the amount of $697,090.42.

following considerations should be considered in a court's analysis of whether a creditor should be authorized to pursue and prosecute the debtor's claims:

      (i)     are the estate's claims colorable;

      (ii)    did the debtor-in-possession unjustifiably refused to pursue such claims; and

      (iii)   did the creditor receive leave from the bankruptcy court to pursue such claims.

*Id.* 832 F.2d at 1397 ("We agree that these are relevant considerations, though not necessarily a formalistic checklist."). The Court, as a court of equity, has the authority to grant derivative standing to Huff in these chapter 7 cases. *See PW Enters., Inc. v. North Dakota Racing Comm'n (In re Racing Servs., Inc.),* 540 F.3d 892 (8th Cir. 2008); *Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.),* 199 F.3d 1029 (9th Cir. 1999). An analysis of these considerations supports the Court's authorization of Huff to pursue and prosecute the Claims on behalf of the estates.

**A.    The Estates Hold Colorable Claims Against SKH**

      14.    "On the issue of whether a claim is 'colorable,' the Court should consider whether the Committee has asserted 'claims for relief that on appropriate proof would support a recovery.'" *In re iPSC, Inc.,* 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (citing *In re Tennessee Valley Steel Corp.,* 183 B.R. 795, 800 (Bankr. E.D. Tenn. 1995) (quoting *In re STN Enters., Inc.,* 779 F 2d 901, 905 (2d Cir. 1985)). In determining this issue, courts view the "colorable" standard as "whether the claim would survive a motion to dismiss for failure to state a claim." *Id.* at 292; *see Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) (setting forth applicable standard for motion to dismiss). The claims must be construed in the light most favorable to the estates and the facts as alleged must be accepted as true. *In re iPSC, Inc.,* 297 B.R. at 291-92; *see Spring Service Texas, Inc. v. McConnell (In re McConnell),* 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989) (stating that claims are colorable if there is a possibility of success).

15.     There are colorable estate claims against SKH for breach of the representations and warranties in the APA and recovery of fraudulent transfers/conveyances related to Ausam overpaying for the Properties.[2]  Huff intends on taking Rule 2004 examinations (or depositions pursuant to Part VII of the Federal Rule of Bankruptcy Procedure) of SKH and other parties to further investigate the identified causes of action and any other causes of action that may exists against SKH.

**B.      The Trustee Has Consented to Huff's Standing**

16.     The Trustee has consented to Huff's filing and prosecuting the Claims against SKH. This consent negates the requirement that Huff show that the Trustee unjustifiably refused to prosecute the Claims.  "When the party seeking derivative standing has the consent of the debtor-in-possession, the most important factor to be considered is whether the claims are colorable." *In re iPSC, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003).[3]  A number of courts have held that a creditor should be authorized to file suit when a trustee consents to the creditor's request to file suit and the creditor has shown that suit by the creditor is (i) in the best interest of the bankruptcy estate; and (ii) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceeding. *PW Enters., Inc. v. North Dakota Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892 (8th Cir. 2008); *Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.)*, 199 F.3d 1029 (9th Cir. 1999).

17.     The Trustee's consent shows that Huff is not usurping the Trustee's role.  The Trustee has requested clarification that any recoveries on the Claims will be received by the

---

[2]      Huff has conducted its own legal analysis of the breaches of representations and warranties and will share same with the Court *in camera*  but at this time does not believe it is appropriate to disclose this work product.

[3]      *See also In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001); *In re Spaulding Composites Co., Inc.*, 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997) ("The question, then is whether a DIP may stipulate to representation by an unsecured creditors' committee. We hold that it may."); *In re Enron Corp.*, 319 B.R. at 132 ("Where a debtor in possession consents to suit by a committee, the test is met.").

Trustee on behalf of the estates. The Trustee has requested and Huff agrees that any settlement offers will be conveyed to the Trustee and that the Trustee will receive periodic reports from Huff of the status of the investigation and prosecution of the Claims. The Trustee has agreed that, subject to further order of the Court, Huff will be reimbursed for its reasonable costs and expenses from the first dollars received from the Claims.

18.     Huff's filing suit on and prosecution of the Claims is in the best interest of the Debtors' estates because Huff has identified significant value that may yield substantial recovery for the benefit of the estates and the estates have no resources to pursue the Claims. Huff's filing suit on and prosecution of the Claims is also necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. *See Glinka v. Murad (In re Housecraft Indus. USA, Inc.)*, 310 F.3d 64, 71 (2d Cir. 2002) (holding both trustee and secured lender had standing to file joint complaint because it was a fair and efficient resolution of the bankruptcy proceeding because, in part, it prevented the likelihood of future litigation between the trustee and the lender). Significant value that should be recovered by the estates could be lost if Huff is not authorized to assert and prosecute the Claims. *See Whyte v. Williams (In re Williams)*, 152 B.R. 123, 128 (Bankr. N.D. Tex. 1992) (stating that "[w]ith a statute of limitations running, the creditors' committee successfully obtained [authorization to bring a action on behalf of the estate] in this case with respect to one cause of action.").

C.     **Huff Should Be Granted Leave Pursuant To This Motion**

19.     Huff seeks leave from the Court for authority to assert and prosecute the Claims on behalf of the Debtors' estates.

20. Huff and its counsel have performed an extensive and ongoing review of the Claims. Huff's counsel charged with the investigation and prosecution of the Claims is experienced in litigation of this type and has recovered substantial judgments in similar cases

WHEREFORE Huff respectfully requests that this Court grant this Motion together with such further relief as may be just and proper.

Respectfully submitted this 28th day of July, 2009.

ANDREWS KURTH LLP

By: /s/ Timothy A. Davidson II
Hugh Ray
State Bar No. 16611000
Timothy A. Davidson, II
State Bar No. 24012503
600 Travis, Suite 4200
Houston, Texas 77002
(713) 220-4200 (telephone)
(713) 220-4285 (telecopy)

ATTORNEYS FOR THE HUFF ENERGY FUND, L.P.

## CERTIFICATE OF SERVICE

I hereby certify that on July 28 2009, a true and correct copy of the foregoing Motion was served via ECF on those parties set up for ECF notice, and by United States First Class mail, postage prepaid, on the persons and entities listed on the attached Service List.

/s/ Timothy A. Davidson II
Timothy A. Davidson II

**ENTERED**
12/28/2009

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 08-38222 |
| NORAM RESOURCES, INC., and | § | |
| | § | Chapter 7 |
| AUSAM ENERGY CORPORATION, | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |

## ORDER GRANTING THE HUFF ENERGY FUND L.P.'S MOTION FOR AUTHORITY TO ASSERT CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES
### [This Order corresponds to Docket No. 137]

Upon the Huff Energy Fund L.P.'s Motion for Authority to Assert Causes of Action on

Behalf of the Debtors' Estates (the "Motion"), and the Court having jurisdiction over the Motion

pursuant to 28 U.S.C. § 1334; and the Motion being a core proceeding under 28 U.S.C. §

157(b)(2); and after due and sufficient notice of the Motion; and after due deliberation and good

cause appearing that the relief sought in the Motion is in the best interests of the Debtors' estate

and is necessary and beneficial to the fair and efficient resolution of the Debtors' bankruptcy

proceedings, it is hereby ORDERED as follows:

1.      That the Motion is GRANTED.

2.      That pursuant to 11 U.S.C. §§ 105 and 503(b) The Huff Energy Fund, L.P.

("Huff"), as a representative of the Debtors' estates and on behalf of the estates, is authorized

and granted standing to investigate, commence and prosecute any and all legal proceedings and

actions (including appeals) in any court or other tribunal of competent jurisdiction related to the

Claims (as defined in the Motion), including filing complaints related to such Claims. Huff is

further given exclusive authority to make all procedural, strategic, substantive and logistical

decisions concerning any aspect of the above-described Claims to be brought pursuant to this

Order by ~~the Committee~~ Huff, provided, however, that Huff will provide any settlement offers and periodic status updates to the Chapter 7 Trustee (the "Trustee"). Should Huff decide not to investigate, commence and prosecute the Claims, it shall provide notice of such decision to the Trustee and SKH and the Trustee shall have exclusive control of the Claims.

3. That in connection with the above-referenced Claims, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to Huff shall vest in Huff and its representatives, and the Trustee and Huff are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses.

4. That the Trustee's providing documents and communications to Huff shall not constitute a waiver of any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) and likewise Huff's providing documents and communications to the Trustee shall not constitute a waiver of any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral).

5. If Huff and SKH have not closed and consummated their draft settlement agreement on or before January 15, 2010, Huff is authorized to begin conducting discovery regarding the Claims. Huff shall not propound any discovery regarding the Claims prior to January 15, 2010. Nothing in this Order shall be deemed an adjudication of the Claims.

Signed this 28 day of _December_, 2009.

UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 7

**PLAINTIFF'S FIRST REQUESTS FOR
PRODUCTION TO DEFENDANTS THE
HUFF ENERGY FUND, L.P.
AND BARRY BORAK**



# AUSAM
ENERGY CORPORATION

16 October 2008


Mr. Bryan Bloom
The Huff Energy Fund L.P.
67 Park Place
Morristown, New Jersey 07960

> Re: Proposed amendments with respect to Ausam Energy Corporation and Noram
> Resources, Inc. 9% Senior Secured Convertible Debenture due July 3, 2012 (the
> "Debenture")

Dear Brian:

Due to the ongoing nature of our capital raising program, some of the issues we have
been discussing regarding the upcoming private placement and warrant exchange
program are likely to recur. We would therefore like to propose the following:

- In order to obtain a one-time waiver and release of claims related to the
  private placement and warrant exchange program as described to the board of
  directors at the meeting held on Monday, October 13, Ausam Energy
  Corporation ("Ausam") would make either a one-time payment of US$28,564
  (0.1% of the outstanding amount of the Debenture) or would issue to The Huff
  Energy Fund L.P. ("Huff") warrants to purchase an additional 50,000 common
  shares of Ausam stock at a price of US$1.50 per share, with the warrants to be
  exercisable for a period of five years.

In addition, we would propose to clarify the terms of the Debenture to allow for future
offerings of Units containing warrants since these seem to be much preferred by our
capital providers. Therefore, we would suggest the following:

- Amend the definition of Current Market Price per Share to read:

    o **"Current Market Price per Share"** means the weighted average
      price per Share on the TSX-V (or, if the Shares are not listed
      thereon, or are listed on more than one stock exchange, then on
      such stock exchange on which the Shares are listed having the
      highest volume of Shares traded thereon, or if the Shares are not
      listed on any stock exchange, then on the over-the-counter market)
      for twenty (20) trading days in any consecutive thirty (30) day
      period ending on the fifth (5th) trading day preceding the date of
      determination. The weighted average price shall be determined by
      dividing the aggregate sale price of all Shares sold on said
      exchange or market, during the said twenty (20) trading days
      selected by the Corporation in such consecutive thirty (30) day



EXHIBIT

7

period by the total number of Shares so sold. **[The date of determination of the Current Market Price per Share shall be the later of the date of delivery of the Financing Notice or any Revised Financing Notice, as applicable. Any foreign exchange calculations required to be made in connection with determinations relating to the Current Market Price per Share shall be determined using the Bank of Canada noon rate on the day preceding the date of delivery of the Financing Notice or any Revised Financing Notice, as applicable];**

- Amend Section 6.14 to put a limitation on when a proposed financing must close.

  - **6.14** - Until the Maturity Date, the Corporation covenants and agrees that, subject to any required approval from the TSX-V or shareholders of the Corporation, the Holder shall have the right of first refusal to participate in respect of any future financing of the Corporation (the **"Proposed Financing"**). The Corporation shall provide the Holder with written notice setting out the terms of any such Proposed Financing in reasonable detail (the **"Financing Notice"**) and, unless the Holder provides written notice to the Corporation that the Holder is participating in such Proposed Financing (the **"Participation Notice"**) within seven (7) days of receipt of the Financing Notice, the Holder shall be deemed to have elected not to participate on the terms set out in the Financing Notice. If the terms of the Proposed Financing change materially from those set out in the Financing Notice or a Revised Financing Notice (as hereinafter defined), the Corporation shall provide the Holder with a further written notice setting out such revised terms in reasonable detail (the **"Revised Financing Notice"**) and, unless the Holder provides a Participation Notice within seven (7) days of receipt of the Revised Financing Notice, the Holder shall be deemed to have elected not to participate on the terms set out in the Revised Financing Notice. **[For the purposes of this section 6.14, the terms of a Proposed Financing shall be deemed to have materially changed if the Corporation does not complete the transactions contemplated by the Financing Notice or Revised Financing Notice, in whole or in part, within [60] days of the delivery of the Financing Notice or any Revised Financing Notice, as applicable. ]**

- Amend Subsection 6.23(i) to allow for units, flow-through shares and issuances pursuant to Ausam's stock option plan.

  - **6.23(i)** - The Corporation will not issue Shares at a price below (i) the Current Market Price per Share; or (ii) if the Shares are not listed for trading on a recognized stock exchange or the over-the

counter market as contemplated by the definition of Current Market Price per Share, the fair market value per Share (as determined by an investment bank agreed upon as between the Holder and the Parent).

[For the purposes of this subsection, the Corporation may issue (i) units consisting of Shares and warrants to purchase Shares ("Units"); or (ii) Shares on a flow-through basis pursuant to the *Income Tax Act* (Canada) or equivalent legislation in the United States ("Flow-Through Shares"), provided that the issue price per Unit or Flow-Through Share is not below the Current Market Price per Share or the fair market value per Share as contemplated herein.]

The date of determination of the fair market value per Share, if required, shall be the later of the date of delivery of the Financing Notice or any Revised Financing Notice, as applicable. Any foreign exchange calculations required to be made in connection with determinations relating to the fair market value per Share, if required, shall be determined using the Bank of Canada noon rate on the day preceding the date of delivery of the Financing Notice or any Revised Financing Notice, as applicable.

The valuation of convertible securities shall be determined using the Black-Scholes method of option valuation with a volatility of 100%, or such other value as the auditors of the Corporation have determined to be reasonable.

Notwithstanding anything in this subsection, the Corporation is permitted to issue Shares with respect to (i) options granted and exercised from time to time in accordance with the Corporation's stock option plan and the policies of the TSX-V; (ii) Shares issuable pursuant to convertible securities of the Corporation outstanding as of October 20, 2008; and (iii) Shares issuable pursuant to convertible securities of the Corporation where the issuance of such convertible securities was in accordance with the terms of this Debenture];

- Amend subsection 6.23(e) to allow for the repayment of the Bridge Loan.

  o 6.23(e) The Corporation will not, except in respect of outstanding First Preferred Shares, Series 2 in the capital of the Parent, repurchase or redeem any of its outstanding securities prior to the Debentures, in accordance with the terms hereof, except as provided in Section 6.24. [Notwithstanding the foregoing, the Corporation may redeem outstanding debt securities of the

> Corporation where such debt securities are issued in accordance with the terms of this Debenture, the Corporation is not in default of any payments due to the Holder hereunder and such payments will not cause a default of any payments due to the Holder hereunder;]

- Correct the adjustment formula and clarify that the issuance of a convertible debenture does not trigger an adjustment unless it is actually converted.

   o **5.4(b)** - If and whenever at any time and from time to time the Corporation shall issue Shares, or debt, shares, warrants, options or other securities convertible into Shares [(collectively **"Convertible Securities")**], in each case at a price, conversion price or exercise price, for Shares, respectively, below the Conversion Price, the Conversion Price shall, subject to applicable stock exchange rules, be proportionally adjusted effective immediately after [**the issuance of such Shares or Convertible Securities**] such that the Conversion Price shall be equal to the price per Share obtained by multiplying the Conversion Price by a fraction, of which the numerator shall be the number of Shares outstanding on the date of such issuance (not including the Shares issued on such date [**or the Shares issuable upon conversion or exercise of such Convertible Securities**]) plus the number of Shares which the aggregate consideration received for all [of] the securities so issued would purchase at the Current Market Price per Share, and of which the denominator shall be the number of Shares outstanding on the date of such issuance (including the Shares issued on such date [**and the Shares issuable upon conversion or exercise of such Convertible Securities**]), provided, however, that no such adjustment to the Conversion Price shall be made with respect to the circumstances set out in Section 5.5[, **and provided further that no such adjustment pursuant to this Section 5.4(b) shall cause the Conversion Price to increase.**] Notwithstanding the foregoing, no adjustment as contemplated in this subsection shall me made with respect to convertible debt issued by the Corporation unless and until such convertible debt is actually converted into Shares. The valuation of convertible securities shall be determined using the Black-Scholes method of option valuation with a volatility of 100%, or such other value as the auditors of the Corporation have determined to be reasonable.

We look forward to discussing these proposals with you at your earliest convenience.

Sincerely,


Mark G. Avery
President and Chief Executive Officer

# EXHIBIT 8

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANTS THE HUFF ENERGY FUND, L.P. AND BARRY BORAK



21 November 2008


Mr. Bryan Bloom
The Huff Energy Fund, L.P.
67 Park Place, 9th Floor
Morristown, NJ 07960

Re: Status of Proposal to Clarify Provisions of the US$25,000,000 9% Senior
Secured Convertible Debenture due July 3, 2012 dated July 3, 2007 (the "Debenture")
among Ausam Energy Corporation ("Ausam"), Noram Resources, Inc. and The Huff
Energy Fund, L.P.

Dear Bryan:

As you know, we have been working with you and Barry regarding issues related to
Ausam's efforts to raise capital since July 2008. As part of these ongoing discussions, on
October 16, 2008, we sent The Huff Energy Fund, L.P. ("Huff") a written proposal (the
"Proposal") addressing certain issues relating to the Debenture. To date, we have
received no response to the Proposal, but we have been given verbal assurances that Huff
has no interest in pushing Ausam into bankruptcy.

We want to preserve and enhance the position of Huff and all stakeholders of Ausam.
The delay is causing a deterioration in that position. To that end, we ask that Huff
consider the following:

- Since June 2008, Ausam has been in continuous negotiations with third parties
  and our current shareholders regarding raising additional equity capital. Huff
  has been kept apprised of these efforts, and has never voiced any objection to
  our plans.
- Since June 2008, Ausam's cash position has been significantly depleted, which
  has been regularly communicated to the directors and Huff, and has now
  reached a critical juncture.
- During that time period, capital availability to companies in Ausam's position
  has become even more severely constrained, particularly from sources
  unfamiliar with Ausam, due to general market conditions and falling crude oil
  prices.
- During that time period, our stock price has declined from a close of US$2.50
  (CDN$2.51) per share on July 21, 2008 to a close yesterday of US$0.90
  (CDN$1.10).
- The delay in closing a financing is likely to cause significant additional dilution
  to existing shareholders.

EXHIBIT

8

13103 FM 1960 West, Suite 210   Houston, Texas 77065   Tel. (832) 678-2200   Fax. (832) 678-2205

Mr. Bryan Bloom
November 21, 2008
Page 2

- The Company has an outstanding warrant exercise program (the "Warrant Program") under which, following discussions with our warrantholders, we propose to reduce the exercise price per warrant from US$1.50 to US$1.20 in order to entice any of the warrantholders to exercise. In addition, upon exercise of an outstanding warrant, the warrantholder will receive ½ of a new warrant (an incentive warrant) at the same US$1.20 price for two years. The incentive warrant will be valid for five years, with the exercise price escalating to US$1.32 in the third year, US$1.46 in the fourth year, and US$1.60 in the final year.

- These sources of capital, which we have developed with the knowledge and apparent consent of Huff, are now vital to Ausam in light of present market conditions. However, we believe that any interpretive issues we have with Huff should be resolved now to allow our investors certainty regarding Huff's position on the equity offering closed on October 24, 2008, our raising of $2,000,000 in advance of the Warrant Program, and on the terms of the Warrant Program. We believe that the outstanding issues are straightforward and should be able to be quickly resolved through reasonable discussion between willing parties.

- The funds we have raised, and are attempting to raise, have been and will be used to maintain our ownership interest in certain oil and gas properties, a portion of which serve as Huff's collateral under the Debenture. As you know, Ausam paid $1.6 million using the funds provided by Messrs. Hitchcock and Mooney in October 2008 to renew the key lease on the Iola prospect.

We have a board of directors meeting scheduled for 10:00 a.m. Houston time on Monday, November 24. We would like to be able to present Huff's response to the Proposal of October 16th at that time. We would also like to better understand your position with respect to the re-priced Warrant Program and draft credit facilities presented to Huff by that time as well.

It is not our wish to be placed in an adversarial relationship with Huff, who we consider to be our partner in the development of Ausam. We do hope that Huff will recognize the urgency expressed in this letter and respond in a positive and timely manner.

I would be pleased to discuss any and all of the matters set forth in this letter with you at your earliest convenience.

Sincerely,


Mark G. Avery
President

# EXHIBIT 9

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANTS THE HUFF ENERGY FUND, L.P. AND BARRY BORAK

*WRH Energy Partners, L.L.C.*
*1776 On The Green*
*67 Park Place*
*Morristown, New Jersey 07960*
*Phone 973-984-1233*

SETTLEMENT COMMUNICATION PURSUANT TO TEXAS RULES OF
EVIDENCE SECTION 408 AND SIMILAR RULES IN OTHER RELEVANT STATES
AND IN FEDERAL JURISDICTIONS.

November 28, 2008

Ausam Energy Corporation
Noram Resources, Inc.
13103 FM 1960 West – Suite 210
Houston, Texas 77065
Attention: Mark G. Avery, President and Chief Executive Officer

Re:     Debenture issued to The Huff Energy Fund, L.P.

Dear Mark:

Ausam Energy Corporation (together with its subsidiary Noram Resources, Inc., the "Company") has requested a waiver and amendment of certain covenants in the Debenture (the "Debenture") issued to The Huff Energy Fund, L.P. ("Huff"). The Company has made this request in connection with several ongoing or completed financings, including (i) a private placement of equity, (ii) a warrant early exercise program, and (iii) a financing in the form of a "loan" (the "Loan") from Ausam's chairman of the Board (the "Chairman") (who is also affiliated with SKH Management, L.P. (together with its affiliates, "SKH")) and a company affiliated with an individual shareholder of the Company. Upon repayment of the Loan, the Chairman and this company shall have each received consideration in excess of $1 million.

The Loan caused a breach of Section 6.23(g) of the Debenture, and based on the additional information the Company has been providing, we are continuing to evaluate whether the Loan also breached Section 6.23(j) of the Debenture. The warrant early exercise program and the equity private placement breached Sections 6.14 and 6.23(i) of the Debenture. These breaches of the Debenture, while material and substantial, are not the only breaches committed by Ausam since we made our investment in the Company.

In February 2008, we first learned of significant SKH title defects and operational problems that the Company had discovered beginning in mid-2007 in respect of properties subject to mortgages executed by Noram in favor of Huff (collectively, the



Ausam Energy Corporation
Noram Resources, Inc.
November 28, 2008
Page 2

"Mortgages"). These matters required <u>immediate</u> notification to Huff, as well as Ausam's board of directors. The Company's failure to provide Huff with that notice violated Section 6.20 of the Debenture and Section 4.2(j) of the Texas and Arkansas Mortgages, as well as Noram's representations and covenants in Sections 4.2(a), (b) and (h) of the Texas and Arkansas Mortgages, Sections 4.3(a) and 4.4(a) of the Louisiana and Alabama Mortgages, Sections 3.02(c), 3.02(d) and 3.03 of the Mississippi Mortgages, and the Debenture. The Company also breached the Mortgages by failing to provide Huff with a complete list of the leases to be included in the Mortgages prior to the closing of our investment last year, and by failing to keep Huff apprised as new leases for these or other prospects are signed. In addition, the Company breached Section 6.15 of the Debenture by allowing its director and officer insurance coverage to lapse for a period of 42 days. Further, these matters in combination also breached Sections 6.2 and 6.8 of the Debenture. Other breaches of agreements with or in favor of Huff may have occurred as well.

The misrepresentations and omissions regarding the SKH assets constitute a significant issue. We have repeatedly voiced our strong opinion that the Company needs to use the substantial claims it has against SKH to negotiate an extension of the date after which these leases revert back to SKH. As recently as Tuesday, November 25, we were told that SKH had agreed to such an extension, and that getting a written agreement from SKH on this issue is not a challenge. One day later we were told the extension would not be forthcoming absent the negotiation of additional matters unrelated to the breaches committed by SKH. If the Company encounters continued resistance from SKH in this respect, we expect the Company to act as needed in order to procure the extension or pursue the claims against SKH.

The Company has made certain statements and provided proposals that would raise capital for the Company and, ultimately, if all steps are completed, provide the Company with capital to repay its indebtedness to Huff. These statements include, but are not limited to, an explicit representation just recently that Ausam can raise $2 million from the warrant early exercise program immediately and, ultimately, $3.5 million if given the full 30 days required by the TSXV Exchange.

As you are well aware, each day that goes by reduces the period of time left before the primary terms on the leases expire and the time period before the leases must be assigned to SKH. The ability of the Company to develop the leases, whether by itself or with others, is diminishing and, with it, the ability of the Company to repay the Debenture.

Notwithstanding the breaches and other negative developments described above, and in recognition of the Company's confidence with respect to its negotiations with SKH and its capital raising efforts, Huff is willing, with a view toward protecting its security and the ability of the Company to repay the Debenture, to enter into a

Ausam Energy Corporation
Noram Resources, Inc.
November 28, 2008
Page 3

forbearance agreement, in form and substance satisfactory to Huff, pursuant to which
Huff agrees to forbear, subject to the terms and conditions thereof, from exercising its
rights and remedies under the Debenture and associated security documents to accelerate
its debt and foreclose on the prospects as a result of the existing defaults (the
"Forbearance Agreement"). However, this willingness and continued cooperation is
specifically subject to satisfaction of the following (collectively, the "Forbearance
Conditions Precedent") on or before December 11, 2008, unless an earlier date is
specified:

- Execution of the Forbearance Agreement, which shall contain, among other things
  and in addition to the Forbearance Conditions Subsequent (as defined below), (i)
  an acknowledgement by the Company of the existing Events of Default, (ii) an
  agreement by the Company that, in the event it fails to meet its obligations as
  described in the Forbearance Agreement, it will not assert that the existing Events
  of Default have not occurred, (iii) an acknowledgement by the Company of
  receipt of notice of the existing Events of Default described above, and that such
  notice is sufficient for purposes of Section 7.13 of the Mortgages, (iv) a clear
  statement that the Forbearance Agreement applies only to the specific events of
  default described therein, (v) an agreement by the Company to escrow 15% of any
  equity raised from the warrant early exercise program and the capital raising
  program as segregated collateral for the Debenture, and (vi) an amendment of
  Section 6.23(j) of the Debenture satisfactory to Huff.

- The Company shall close on at least $2 million in equity financing through the
  warrant early exercise program.

- Consistent with the 15% escrow to be set forth in the Forbearance Agreement as
  described above, the Company shall escrow $300,000 of the foregoing $2 million
  as segregated collateral for the Debenture.

- Also consistent with the 15% escrow to be set forth in the Forbearance Agreement
  as described above, the Company shall escrow 15% of any equity raised in excess
  of $2 million on or before December 11, 2008 from the warrant early exercise and
  capital raising program as segregated collateral for the Debenture.

- The Company shall pay Huff a consent fee consisting of (i) $150,000 and (ii) the
  issuance of 300,000 warrants, on the same terms as the warrants issued to the
  Chairman in connection with the Loan, as well as all legal fees incurred by Huff
  in connection with this transaction whether incurred before or after the date
  hereof.

Ausam Energy Corporation
Noram Resources, Inc.
November 28, 2008
Page 4

- The Company shall, by December 3, 2008, amend the terms of Huff's existing warrants so as to extend the expiration of such warrants to December 3, 2013, and to adjust the strike price to $.1984 per warrant share.

- The Company shall provide Huff an executed agreement with SKH that is satisfactory to Huff, and which, in any event, extends the Company's time period to market and drill the prospects that are subject to reversion to SKH to a date that is no earlier than July 4, 2012. Such agreement shall not, without Huff's prior written consent, surrender any of the Company's properties to SKH or allow SKH to realize value from these properties beyond its current contractual rights (other than the reversion of the leases as currently set forth therein, which, again, shall be extended as described above).

- The term of the Loan shall be extended to the earlier of October 4, 2012, or 91 days after the Company's full repayment of the Debenture, including all accrued interest and other amounts owing thereunder or with respect thereto.

- The lenders under the Loan shall enter into an appropriate inter-creditor agreement satisfactory to Huff pursuant to which they agree, among other things, to not interfere with Huff's exercise of its rights under the Debenture and related documents.

- No additional breach under or violation of the Debenture or any other agreement with or in favor of Huff.

- No material adverse change after the date hereof in the business, finances or prospects of the Company.

If all of the foregoing conditions are met by December 11, 2008, the Forbearance Agreement shall take effect and remain in effect, subject to the conditions described below, in order to allow the Company to raise additional capital in accordance with the term sheets that have been presented to Huff to date. The conditions to the Forbearance Agreement remaining in place (collectively, the "Forbearance Conditions Subsequent") include, without limitation:

- A meeting between Petro Capital/Thomas H. Lee Fund ("PCTHL") and Huff in Morristown, New Jersey, at a mutually convenient time.

- If Huff so elects, the Company shall arrange a meeting between Huff and Pegasi Energy Resources Corporation ("Pegasi") and/or TR Energy, Inc. ("TR Energy"), at a mutually convenient time. If requested, the Company shall provide Huff with complete access to all due diligence and other information obtained by the Company concerning the Cornerstone project, Pegasi, PCTHL and TR Energy.

Ausam Energy Corporation
Noram Resources, Inc.
November 28, 2008
Page 5

- As stated above, the Company shall add to the escrow 15% of any equity raised after December 11, 2008 from the warrant early exercise and capital raising program as segregated collateral for the Debenture.

- On or prior to January 15, 2009, the Company shall enter into a definitive agreement for the proposed merger with Sirrah Energy Corporation ("Sirrah") and Pegasi (the "Proposed Merger") or a more favorable transaction concerning the Cornerstone project, in each case, on terms acceptable to Huff. From a brief review of the summary material presented to date with respect to the Proposed Merger, and without limiting Huff's discretion to approve the same or any other transaction, such terms include, among others, (i) no incurrence by the Company of any debt obligation, including the obligation to honor a put, with respect to the formation and funding of Sirrah or any other action required to facilitate the Proposed Merger or any other Cornerstone transaction, provided, that the Company may borrow money to finance the Proposed Merger or other transaction in compliance with clause (iii) below and otherwise on terms satisfactory to Huff, (ii) no break-up fee payable by the Company in the event that the Proposed Merger, or any other Cornerstone transaction, does not take place, and (iii) any non-Huff debt financing of the Proposed Merger or any other Cornerstone transaction shall be unsecured until Huff is paid in full in cash and the lenders with respect thereto enter into appropriate inter-creditor agreements satisfactory to Huff.

- On or prior to May 15, 2009, the Company shall repay the Debenture, at full face amount, plus accrued but unpaid interest and all other amounts outstanding thereunder, plus an appropriate prepayment premium acceptable to Huff. None of the cash or in kind payments paid to Huff described above constituting Forbearance Conditions Precedent shall in any manner be treated as a reduction of any amount outstanding under the Debenture, including principal and interest.

- The Company shall consult with Huff prior to any further negotiations concerning the Proposed Merger or any other business combination transaction. The Company will not enter into any agreement, letter of intent, or the like concerning the Proposed Merger or any other business combination transaction, and will not close on any aspect thereof, or any other transaction concerning Cornerstone, without Huff's prior written consent.

- The Company shall provide Huff with a budget for 2009. The inclusion of any individual item in the budget in excess of $100,000 shall require Huff's prior written consent. The Company will be prohibited from spending amounts in excess of the budget without Huff's prior written approval.

Ausam Energy Corporation
Noram Resources, Inc.
November 28, 2008
Page 6

- The Company shall grant Huff the right to speak with employees and other representatives of the Company as Huff may deem advisable in connection with the Company's business, operations and prospects.

The Forbearance Agreement shall terminate upon the first to occur of (i) May 15, 2009, (ii) the repayment of the Debenture, and (iii) the failure of any of the Forbearance Conditions Subsequent to occur or the violation of any of the requirements set forth in the Forbearance Agreement. In the case of a termination pursuant to clause (iii), the Forbearance Agreement shall provide that all monies in escrow will immediately be paid over to Huff, that Huff can pursue its rights and remedies, including, without limitation, with respect to the leases, and that the Company will not interfere with Huff doing so.

Upon repayment in full of all amounts outstanding under the Debenture, any amounts remaining in escrow as described above will be paid over to the Company (assuming there were no prior breaches that caused the escrow amount to be paid over to Huff). On the other hand, the failure to meet any one of the deadlines set forth in this letter will cause the amounts in such escrow to be paid over immediately to Huff, without limiting Huff's ability to exercise its rights and remedies under the Debenture and related documents.

In summary, if the Company delivers as it has promised, then Huff will be repaid and all parties will realize the economics for which they bargained. If not, Huff may proceed to exercise its rights and remedies in an attempt to mitigate the potential damage due to further deterioration in the value of its collateral over time.

Huff's relationship to the Company is as a lender whose repayment depends on the security provided by the Company to Huff and, ultimately, on the success of the Company. We are taking these steps to assure that transactions entered into by the Company do not endanger Huff's security or the ability of the Company to pay the indebtedness.

**Obviously, time is of the essence. Each month that goes by reduces the cash flow attainable by us from the Company's producing assets. Please confirm in writing your agreement with the foregoing such that Huff receives this confirmation on or before 5:00 p.m. Eastern Standard Time on Wednesday, December 3, 2008. Upon receipt of that confirmation, we will direct our lawyers to commence drafting the documents.**

The proposal contained herein shall be void and of no force or effect if Huff has not received the confirmation described above by the time and on the day set forth above. Such proposal does not constitute a commitment to forbear or otherwise act or refrain from acting in any manner whatsoever. No such commitment shall exist unless and until execution by Huff and the Company of the Forbearance Agreement and other definitive

Ausam Energy Corporation.
Noram Resources, Inc.
November 28, 2008
Page 7

documentation in connection therewith, and then only in accordance with the terms and conditions thereof.

The proposal set forth herein is a summary of general terms only and is not intended to be exhaustive with respect to the terms of any proposed forbearance or other transaction, the terms of which shall be set forth in definitive documentation with respect thereto.

The Company shall keep this letter and its contents confidential, and shall disclose the same only to its directors and officers and only as needed in order to determine whether to provide the confirmation requested above.

THE HUFF ENERGY FUND, L.P. by its General Partner, WRH Energy Partners, L.L.C.

By: _____
Name:    $L_{ryan} \Delta lva$
Capacity:    $Cou_{n}e$ 1

Acknowledged and Agreed this ___ day of December, 2008

AUSAM ENERGY CORPORATION ·

By: _____
Name:    ·
Capacity:

NORAM RESOURCES, INC.

By: _____
Name:
Capacity:

# EXHIBIT 10

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANTS THE HUFF ENERGY FUND, L.P. AND BARRY BORAK

# 🖩 Bennett Jones LLP

4500 Bankers Hall East, 855 – 2nd Street SW
Calgary, Alberta, Canada T2P 4K7
Tel: 403.298.3100   Fax: 403.265.7219
www.bennettjones.ca

Michael Der
Associate
Direct Line: 403.298.3374
e-mail: derm@bennettjones.ca
Our File No.: 56065-14

August 20, 2008

**VIA EMAIL AND FAX**

The Huff Energy Fund, L.P.
67 Park Avenue, Ste. 530
New York, NY  10016

Dear Sirs:

**Re:    Proposed Financing by Ausam Energy Corporation ("Ausam")**

Reference is made to the Senior Secured Convertible Debenture of Ausam dated July 3, 2007 (the "**Debenture**"). Please consider this letter as notice pursuant to section 6.14 of a proposed financing (the "**Financing**") by Ausam. The Financing will consist of a private placement of units ("**Units**"), with each Unit consisting of one common share in the capital of Ausam ("**Common Shares**") and one half of one Common Share purchase warrant ("**Warrants**"). Each Warrant will have an exercise price of US$2.33 and have a term of five years. Each Unit will be sold at a price of US$2.33 (deemed equivalent to CDN$2.47 for the purposes of this notice and using the August 19 noon rate published by the Bank of Canada) per Unit the ("**Offering Price**") for aggregate gross proceeds of up to US$15,000,000. The Units will be sold exclusively to persons who are accredited investors by way of prospectus and registration exemption requirements in the United States, Canada and internationally.

The Financing is intended to close on or about August 29, 2008. If you do not intend to participate in the Financing, Ausam requests that you provide written confirmation as soon as possible, in addition to the items requested below, so that Ausam can proceed based on the current expressions of interest from third party investors.

Pursuant to subsection 6.23 of the Debenture, Ausam has determined that the Current Market Price (as defined in the Debenture) as calculated after the close of markets on August 19, 2008, is CDN$2.47 per Common Share. In that regard, we have enclosed a spreadsheet with the Current Market Price Calculation. As foreign exchange rates and the market price may continue to change up to the intended closing date, Ausam requests that, with respect to the Financing, The Huff Energy Fund, L.P.:



EXHIBIT
10

August 20, 2008
Page Two

(i)     acknowledge and confirm the calculation of the Current Market Price as CDN$2.47 for the purposes of the Debenture; and

(ii)    acknowledge and confirm that in relation to the Offering Price and the exercise price of the Warrants, US$2.33 is deemed to be the equivalent of CDN$2.47 for the purposes of the Debenture, including without limitation, the determination to be made under subsection 6.23(i) and for the purposes of calculating any adjustments pursuant to section 5.4 of the Debenture. As such, The Huff Energy Fund, L.P. will be entitled to an adjustment to the Conversion Price (as defined in the Debenture) pursuant to subsection 5.4(b) based upon Offering Price and the actual number of Units issued pursuant to the Financing.

Should you have any questions or concerns, please do not hesitate to me at your earliest convenience.

Yours truly,

BENNETT JONES LLP

Michael Der

| Date | Open | High | Low | CDN$ Close | Volume | Adj Close | Conv. Rate | US$ Adj Close | Vol x Adj. Close |
|------|------|------|-----|------------|--------|-----------|------------|---------------|------------------|
| 12/08/2008 | 2.4 | 2.4 | 2.4 | 2.4 | 100 | 2.40 | 0.9376 | 2.25 | 240 |
| 11/08/2008 | 2.47 | 2.47 | 2.47 | 2.47 | 8,000 | 2.47 | 0.938 | 2.32 | 19,760 |
| 08/08/2008 | 2.4 | 2.5 | 2.4 | 2.5 | 50,000 | 2.50 | 0.954 | 2.39 | 125,000 |
| 07/08/2008 | 2.18 | 2.18 | 2.18 | 2.18 | - | 2.18 | 0.9579 | 2.09 | - |
| 06/08/2008 | 2.18 | 2.18 | 2.18 | 2.18 | 10,000 | 2.18 | 0.9611 | 2.10 | 21,800 |
| 05/08/2008 | 2.44 | 2.44 | 2.44 | 2.44 | 1,200 | 2.44 | 0.9714 | 2.37 | 2,928 |
| 01/08/2008 | 2.42 | 2.45 | 2.42 | 2.45 | 9,900 | 2.45 | 0.9771 | 2.39 | 24,255 |
| 31/07/2008 | 2.44 | 2.44 | 2.44 | 2.44 | - | 2.44 | 0.977 | 2.38 | - |
| 30/07/2008 | 2.44 | 2.44 | 2.44 | 2.44 | - | 2.44 | 0.9776 | 2.39 | - |
| 29/07/2008 | 2.44 | 2.44 | 2.44 | 2.44 | - | 2.44 | 0.9804 | 2.39 | - |
| 28/07/2008 | 2.44 | 2.44 | 2.44 | 2.44 | - | 2.44 | 0.9811 | 2.39 | - |
| 25/07/2008 | 2.12 | 2.44 | 2.12 | 2.44 | 200 | 2.44 | 0.9897 | 2.41 | 488 |
| 24/07/2008 | 2.4 | 2.43 | 2.4 | 2.43 | 11,000 | 2.43 | 0.9914 | 2.41 | 26,730 |
| 23/07/2008 | 2.43 | 2.43 | 2.43 | 2.43 | - | 2.43 | 0.9968 | 2.42 | - |
| 22/07/2008 | 2.4 | 2.47 | 2.4 | 2.43 | 29,000 | 2.43 | 0.9954 | 2.42 | 70,470 |
| 21/07/2008 | 2.51 | 2.51 | 2.51 | 2.51 | - | 2.51 | 0.9947 | 2.50 | - |
| 18/07/2008 | 2.5 | 2.51 | 2.5 | 2.51 | 2,000 | 2.51 | 0.9984 | 2.51 | 5,020 |
| 17/07/2008 | 2.45 | 2.5 | 2. | 2.5 | 32,300 | 2.50 | 0.9984 | 2.50 | 80,750 |
| 16/07/2008 | 2.5 | 2.5 | 2.5 | 2.5 | - | 2.50 | 0.9972 | 2.49 | - |
| 15/07/2008 | 2.44 | 2.5 | 2.44 | 2.5 | 57,000 | 2.50 | 0.9918 | 2.48 | 142,500 |
| | | | | | 210,700 | Avg. | 0.97835 | | 619,941 |

20 Day VWAP

| | CDN$ | | US$ |
|---|------|---|-----|
| $ | 2.47 | $ | 2.41 |

# EXHIBIT 11

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANTS THE HUFF ENERGY FUND, L.P. AND BARRY BORAK

PORTER & HEDGES LLP

ATTORNEYS AT LAW

David R. Jones
Partner
(713) 226-6653 Phone
(713) 226-6253 Fax
djones@porterhedges.com

RELIANT ENERGY PLAZA
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone (713) 226-6000
Telecopier (713) 228-1331
porterhedges.com



**EXHIBIT**

11

February 25, 2010

*By United States First Class Mail*

Mark Avery Avery
3401 Sleepy Hollow Court
Houston, Texas 77019

Ralph D. Davis
145 North Hall
Sugar Land, Texas 77478

Richard Lummis
3110 Ferndale
Houston, Texas 77098

Robert Eriksson
Hovslagargatan 5 3tr
Stockholm SE 11148 Sweden

Alastair J. Robertson
311 Varsity Estates Bay NW
Calgary, Alberta T3B2W6 Canada

William Hitchcock
712 Main Street,
Suite 2150
Houston, Texas 77002

Re:     *In re: Noram Resources, Inc. and Ausam Energy Corporation. Jointly
        Administered under Case No. 08-38222-H4-7 in the United States Bankruptcy
        Court for the Southern District of Texas.*

Gentlemen:

This firm represents William West, the chapter 7 trustee in the above-referenced cases.
The purpose of this letter is to inform you of certain claims that the bankruptcy estate presently
intends to pursue against you as a result of your former service as an officer and/or directors of
Ausam Energy Corporation and/or (collectively "Ausam" or the "company"). Based on the
currently available information, you failed to act diligently and prudently when managing the
affairs of the companies that ultimately caused the bankruptcy filing.

On September 22, 2006, Ausam and SKH Management L.P., SKH Management II L.P.,
SKH Management III LLC., SKH Energy Fund, L.P., and Antares Exploration Fund, L.P.,
(collectively, "SKH") entered into an agreement (the "Acquisition Agreement") whereby Ausam
acquired SKH's leasehold rights to certain oil and gas properties in Texas, Louisiana,
Mississippi, Alabama and Arkansas (the "Leases"), in exchange for up to $35 million, to consist
of 63,417,143 common shares of Ausam and up to $15 million in cash (the "Transaction"). At
your direction, the company publicly announced that the "Leases comprise 18 diverse, drill-
ready oil and gas prospects (the "Prospects") located on approximately 60,000 gross acres
(46,500 net acres) in the onshore Gulf Coast region of the United States."

Despite these representations, the Prospects were not drill-ready, but in fact had
numerous serious title, leasing, and other problems which materially delayed the drilling of the
Prospects. Your failure to ensure that the Prospects that Ausam acquired were drill-ready was a
negligent and fatal error in your duties. It appears that management and the company failed to
perform the necessary due diligence for a transaction of this magnitude. Had the necessary
diligence been performed, any number of actions could have been taken to address the matter,

1838034v1

Letter to Ausam/Noram Officers and Directors
February 26, 2010
Page 2 of 2

including changing the terms of the transaction or not engaging in the Transaction. Furthermore, after completing the Transaction, it appears that management exacerbated the problem by failing to act in a prudent manner to remedy these problems in order to commence the drilling of the Prospects. As a result, the company was deprived of revenue necessary to support continued operations.

In addition, after the Transaction closed and once it became apparent that the Prospects were not drill-ready as represented by SKH, you failed to take any action to pursue the company's legal rights against third parties. The Trustee believes that you received repeated warnings and advisements about the need to protect Ausam's claims and failed to take any action.

A second example of mismanagement involves the company's transaction with Vision Operating LLC. At a time when the company that management was experiencing severe financial problems, the company acquired a 12.5% working interest in the Rice University A-393 IH well without proper authorization. This acquisition required a $1.25 million initial cash outlay and additional commitments for expenses related to ongoing drilling operations. This decision was imprudent and appears to have been made despite knowledge of the company's financial position.

Finally, your failure to prudently manage Ausam's operations and act in the best interest of the company is evidenced by your authorization of the payment of oversized bonuses despite the lack of cash flow and despite any successful drilling results. Additionally, you directed the company to make numerous expenditures that were either unnecessary or excessive.

In summary, your failure to act in a reasonably prudent manner in managing the company and failure to act in the best interest of the company caused Ausam to incur unnecessary expense which it could not repay and which caused the company to file chapter 7. Your actions have severely damaged the company. As a result, the Trustee intends, on behalf of the bankruptcy estates, to pursue claims against you for breach of fiduciary duties owed to the company. The damages caused by your action exceed $10 million. Under applicable law, you may also be liable for exemplary damages.

The Trustee demands a cash payment of $10 million to fully settle and release of claims held by the bankruptcy estates. Prior to commencing litigation, the Trustee invites you to submit a written response. If no response is received within 30 days, it will be assumed that you do not intend to submit a response.

Very truly yours,

David R. Jones

c:  Linda Van den Brink, B.A., LL.B.
145 Wellington Street West
Toronto, ON M5J 1H8
Linda.vandenbrink@chartisinsurance.com
Policy No. 003409517