# EXHIBIT B

# **TRUSTEE'S FIRST MOTION TO COMPEL**



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NORAM RESOURCES, INC. and | § | Case No. 08-38222-H1-7 |
| AUSAM ENERGY CORPORATION, | § | (Chapter 7) |
| | § | (Jointly Administered) |
| Debtors. | § | |
| WILLIAM G. WEST, | § | |
| CHAPTER 7 TRUSTEE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adversary No. 10-3703 |
| | § | |
| HUFF ENERGY FUND, L.P., | § | |
| and BARRY BORAK, | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S FIRST AMENDED COMPLAINT AND
## OBJECTION TO CLAIM OF THE HUFF ENERGY FUND L.P.

William G. West, chapter 7 trustee for Debtors Noram Resources, Inc. ("Noram") and Ausam Energy Corp. ("Ausam") files this First Amended Complaint[1] and Objection to Claim against The Huff Energy Fund, L.P., per the Court's Order of December 29, 2011 (Doc. 40), and the Court's Memorandum Opinion of December 29, 2011 (Doc. 41).

### Summary of the Complaint

1.      The Trustee seeks monetary damages against Defendants The Huff Energy Fund, L.P. ("Huff") and Barry Borak arising out of pre- and post-petition wrongful conduct against the Debtors and their estates. The Trustee also seeks the equitable subordination Huff's proof(s) of claim, including claim(s) as a secured creditor, in this bankruptcy case. The Trustee also seeks exemplary damages, attorney's fees and costs as allowed by applicable law.

---

[1] The Trustee's factual amendments are set out principally in paragraphs 49-78 below.

### Jurisdiction and Venue

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Relief is sought pursuant to 11 U.S.C. §§ 105, 502, 510, Bankruptcy Rule 3008 and other applicable law. This adversary is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

### Parties

4.      The Trustee may be served in this adversary through the undersigned counsel.

5.      The Huff Energy Fund L.P. is a Delaware limited partnership and a creditor in this case. Huff has appeared in this action.

6.      Defendant Barry Borak is an individual and a former director of the Debtor Ausam. Mr. Borak has appeared in this action.

### Relevant Background

#### Ausam and Noram purchase the oil and gas Properties from SKH

7.      On or about September 21, 2006, SKH Management L.P., SKH Management II, L.P., SKH Management III, L.L.C., SKH Energy Fund, L.P., and Antares Exploration Fund, L.P. (collectively "SKH") and Ausam executed an Asset Purchase Agreement (the "APA") under which SKH agreed to convey to Ausam all of SKH's rights, title and interests in numerous oil and gas leases (the "Properties"). Under the APA, Ausam would assign all of its interests in the Properties to Noram; SKH would then transfer title to the assets directly to Noram.

8.      SKH and Ausam and Noram closed on the APA through a series of conveyances beginning on or about January 27, 2007 and concluding on or about July 30, 2008. Ausam paid SKH consideration of approximately US $13.5 million cash, plus 63,417,143 common shares in

Ausam, for the Properties. At the time of the transaction, the value of one common share of Ausam was deemed to be CAD $0.35 per share. If one assumes an approximate exchange rate in this time frame of US $0.85 = CAD $1.00, then Ausam paid SKH consideration of about US $13.5 million cash in, plus common shares in Ausam with a deemed value of approximately US $18,866,600.

### The Properties are pledged as security for a $25 million secured Debenture that Ausam and Noram issue to Huff

9.       On July 5, 2007, approximately six (6) months after the closing conveyances on the APA with SKH first began, Ausam and Noram issued to Defendant Huff a US $25,000,000 9% Senior Secured Convertible Debenture, due five years later on July 3, 2012 (the "Debenture"). Barry Borak, a principal at Huff, was appointed to the board of Ausam and Noram pursuant to Huff's rights under Article 6.21 of the Debenture. Though appointed by Huff, Borak, as a director, had the fiduciary duty and the duty of loyalty to act on behalf of Ausam and Noram.

10.      For approximately six (6) months prior to purchasing this Debenture, Huff conducted due diligence inquiring into Ausam's and Noram's business and commercial matters. This due diligence included (but was not limited to) Huff's examining the merits of Ausam's and Noram's purchase of the Properties from SKH under the APA. Noram and Ausam cooperated fully in Huff's due diligence, and furnished to Huff all information that Huff requested from Ausam and Noram.

11.      As security for the Debenture, Noram and Ausam granted Huff a security interest, mortgage and pledge in all of the properties, rights, assets, and undertakings of every nature whatsoever and wherever situated that Noram and Ausam "may now be possessed of or entitled to or that it may at any time hereafter acquire ... whether freehold, leasehold, or other" interest.

The pledged security for the Debenture accordingly included all of Noram's rights, title and interests to the oil and gas leases included in the Properties that Noram purchased from SKH; Huff thereby obtained a foreclosable lien upon these oil and gas leases.

12.     The Debenture that Huff, Ausam and Noram executed on July 5, 2007, listed thirteen (13) circumstances constituting Events of Default.[2]  The occurrence of any of these Events of Default would allow Huff to accelerate, and demand immediate payment on, the principal and interest due under the Debenture.

13.     Though Huff subsequently stated that Ausam overpaid SKH for the oil and gas leases included in the Properties, *see* Doc. 137, of 7/28/09 at 3, Huff's public statements belie Huff's prior knowledge of the value of these oil and gas leases.  Huff knew at the time it subscribed to the US $25,000,000 9% Senior Secured Convertible Debenture that the Properties that Ausam purchased from SKH had a value more than sufficient to secure the Debenture.  Huff also knew that, with proper development and financing, the Properties would achieve a fair market value significantly greater than the total consideration Ausam paid for them.

---

[2]  The conditions of default under paragraph 8.1 of the Debenture included: defaulting "in the payment of the principal of this Debenture," Debenture ¶ 8.1(a), defaulting "in payment of any interest due on this Debenture," *id.* ¶ 8.1(b), a decree or order of a court adjudging Noram or Ausam "bankrupt or insolvent," *id.* ¶ 8.1(c), Noram or Ausam instituting "proceedings to be adjudicated a bankrupt or insolvent," *id.* ¶ 8.1(d), Noram or Ausam failing to "pay any ... indebtedness in an amount in excess of $500,000, or its equivalent ... when due, in the ordinary course of business ... or if any other default ... relating to the indebtedness in an amount in excess of $500,000 shall occur ... or such indebtedness in an amount in excess of $500,000 shall be declared due and payable ... prior to the date of maturity," *id.* ¶ 8.1(e), if Noram or Ausam "shall fail to comply in all respects with applicable laws," *id.* ¶ 8.1(f), if any amendment were made to the terms, rights, privileges or conditions attaching to the common shares of Ausam which are materially adverse to the interests of Huff, *id.* ¶ 8.1(g), if amendment were made to the terms, rights, privileges or conditions attaching to any securities convertible into common shares of Ausam which were materially adverse to Huff, *id.* ¶ 8.1(h), if facilities or equipment owned by Noram or Ausam "are not operated ... in compliance with all applicable laws," *id.* ¶ 8.1(i), if approvals, permits, certificates, licenses, etc. needed to own and operate Noram's or Ausam's business "are not ... maintained in good standing," *id.* ¶ 8.1(j), a breach of "any other covenant ... contained in this Debenture" for a period of thirty (30) days, *id.* ¶ 8.1(k), if any representation in favor of Huff contained in the Debenture Subscription Agreement shall be untrue and capable of being cured, but remains uncured for a period of thirty (30) days, *id.* 8.1(l), and if "writ, attachment, execution or similar process is levied" against the property of Noram or Ausam and not released within thirty (30) days after such levy, *id.* ¶ 8.7(m).

**Ausam and Noram are successful in developing the Properties**

14.     Confirming Huff's view that the Properties were quite valuable were Noram's successes in developing oil and gas leases included with the Properties.  Specifically, from June 2007 to November 2008, Noram drilled four (4) wells and was planning to participate in a fifth well.   Three (3) of the first four (4) wells that Noram drilled were successful, producing hydrocarbons in commercial quantities.[3]  The Weathorford prospect RDH Farms #1 well, located in Liberty County, Texas, began commercial production on October 24, 2007 and had produced 530 MMcf of gas and 13,040 bbls of condensate through March 31, 2008.  The Quatre prospect Fisher Lindsey #1 well, located in Calcasieu Parish, Louisiana entered production on May 2, 2008, and had produced about 230 MMcf of gas and 6,181 bbls of oil through June 30, 2008. The Nolte Marsh prospect # 1 well in Liberty County, Texas was drilled to a depth of 13,330 feet on or about September 18, 2008 and encountered an estimated 35 feet of net pay.  Test results from the Nolte Marsh #1 well showed the well flowed at an initial rate of approximately 2.5 MMcf per day and 620 barrels of oil per day, or approximately 1,050 barrels oil equivalent per day, through a 10/64" choke.

15.     Based on production streams from these wells, Noram reasonably anticipated revenues of approximately $6 million per year for the calendar year 2009.  Further, given the commercial success of the Nolte Marsh #1 well, Noram intended to drill a "sister" well in the North Constitution prospect in Jefferson County, Texas.  Based on production rates for the Nolte Marsh well, as well as 3D seismic and offset well data, Noram reasonably anticipated that this

---

[3] The Patch I well in Starr County, Texas was not commercially successful.  This well reached a depth of 9,800 feet on or about July 2, 2007.  Though hydrocarbons were present, logging and sidewall cores indicated that the well might not be commercial; the well was accordingly plugged and abandoned.

sister well had the potential to boost Noram's revenues from an expected $6 million per year to somewhere between $8 million to $12 million per year.

16.     At the time of its success in drilling the wells, Noram's business plan concurrently contemplated a reduction in overhead and personnel, as was appropriate for drilling program like that the company was pursuing.  Similarly – although its anticipated revenues would have more than sufficed to allow it to retain the acreage it had under lease – Noram also intended to reduce its acreage under lease by foregoing certain lease renewals.  Ausam and Noram also intended to reduce Noram's capital requirements through various farm-out or other agreements, and to raise additional capital from investors as needed.

17.     In sum, production from the wells at the Wethorford, Quatre and Nolte Marsh prospects meant that Noram and Ausam would have revenues more than sufficient to meet their debt service, costs and other expenses, and were accordingly poised to enjoy financial success. The North Constitution well would have added to this success.

**Huff notices the Properties' commercial success and begins to look for ways to declare an Event of Default, so that Huff could accelerate the Debenture, force a liquidity crisis at Ausam and Noram, and obtain Noram's Properties for itself**

18.     The strong commercial showing of the wells that Noram drilled on the Properties, and the potential for greater commercial success from additional development of the oil and gas leases, did not go unnoticed by Huff.  Consequently, sometime in or near mid-2008, Huff began to look for ways to use its position as a senior secured creditor of Noram and Ausam to obtain exclusive ownership of Noram's interests in the Properties at a below-market cost – to the exclusion and detriment of Ausam, Noram, the equity holders in these companies, and ultimately, to the detriment of other creditors of these companies.  As a Huff employee and/or

principal, Borak was privy to Huff's plans and knew of Huff's true intentions. Borak violated his fiduciary duty to the Debtors by failing to disclose Huff's true intentions.

19.     In particular, Huff began scrutinizing Noram's/Ausam's business conduct in an effort to identify circumstances constituting one or more of the many Events of Default defined in paragraph 8.1 of the Debenture. Huff knew that, if it could identify an Event of Default on the part of Noram or Ausam, Huff could accelerate and declare immediately due and payable the principal and interest on the Debenture. *See* Debenture ¶ 8.1 (in Event of Default, the "Holder may ... declare the Principal Amount and Interest ... to be due and payable and the same shall forthwith become immediately due and payable to the Holder ... ."). Huff also knew that – if it could accelerate the total amount of principal and interest due on the US $25,000,000 9% Debenture – Noram and/or Ausam would lack the liquidity needed to immediately pay off all amounts due under the Debenture and concurrently continue their business operations, and so would be forced into insolvency. Huff could then foreclose on the security provided under the Debenture, *see id.* ¶¶ 3.1, 8.1, or otherwise use its secured position to obtain exclusive ownership of Noram's interests in the Properties.

### To Huff's frustration, Ausam and Noram prove financially sound; Huff then begins to devise its own plan to force an Event of Default

20.     To Huff's disappointment, after issuing the July 5, 2007 Debenture, Noram and Ausam demonstrated financial well-being. Up to June 2008, these entities were able to pay accounts payable and trade accounts in a timely manner and/or on bases acceptable and/or customary in the oil and gas industry, to make payroll, and to otherwise meet current liabilities as they fell due. No Events of Default occurred or were declared by Huff.

21.     Frustrated by Ausam's and Noram's successful management of their business and development of the oil and gas leases included in the Properties, Huff began in the summer of

2008 to formulate its own plan to force an Event of Default, and to create grounds for accelerating the indebtedness on the Debenture. Huff's aim was to cause a liquidity crisis at Ausam and Noram, force the companies into insolvency and then foreclose on the Properties, or otherwise use its secured position to gain exclusive ownership of Noram's interest in the Properties.

22.     Ironically, it was Noram's and Ausam's plans for developing the Properties that played into the hands of Huff's scheme. In particular, Noram and Ausam sought capital to fund a drilling program directed at prospects included in the Properties. Huff knew as early as March, 2008 that, as a result of Noram's desire to further explore and develop the oil and gas leases included among the Properties, and to gain additional capital for potential acquisitions, Noram and Ausam had started to plan additional capital raises, including a private placement of equity, an early exercise of warrants, and a subordinated debt issue.

23.     Based on communications with Huff personnel, Noram and Ausam were aware that an issue could potentially arise with respect to the planned equity private placement, in that the Debenture contained negative covenants. Specifically, paragraph 6.23(i) of the Debenture specified that Ausam "will not issue Shares [in Ausam] at a price below the then Current Market Price, or fair market value (as determined by an investment bank agreed upon as between the Holder [Huff] and the Parent [Ausam]) if the shares are not listed for trading on a recognized stock exchange." Debenture ¶ 6.23(i). Based on the price at which Ausam and Noram planned to issue the equity, these companies were concerned that Huff might claim that the price was below the "Current Market Price, or fair market value" as specified in the Debenture. *See id.*, ¶ 6.23(i). If it were determined that Ausam had completed a private placement of equity at a price below that specified in the Debenture, Huff could argue that an Event of Default had occurred.

See id. ¶ 8.1(k) (Event of Default occurs "if there shall be a breach by the Corporation of any other covenant or condition contained in this Debenture and any such breach continues for a period of thirty (30) days"). Likewise, there existed a concern that a portion of the private debt placement could be construed by Huff as violating a negative covenant of the Debenture. See id. ¶ 6.23(g) ("The Corporation will not enter into any transaction ... with SKH Management, L.P. or its affiliates ... or any other party related to the Corporation having a monetary value greater than US $1,000,000 per annum ... .").

24.    Early on in its capital-raise process, Noram and Ausam thus faced a choice. These companies could obtain from Huff an assurance that Huff would approve of the private placement of equity and debt, and of the warrant early exercise program, and waive any rights (if such rights in fact existed) to assert that the equity and debt placement and warrant early exercise program constituted Events of Default under the Debenture. Alternatively, Noram and Ausam could pursue other available financing which could not arguably be construed by Huff as an Event of Default under the Debenture.

25.    Accordingly, Noram and Ausam approached Huff in or near July 2008, and inquired as to whether Huff would interpret the planned financings as an Event of Default under the Debenture. Huff repeatedly assured Ausam and Noram that it would not interpret the planned capital raises as any type of Event of Default under the Debenture. But, as Noram and Ausam would later learn, Huff's assurances were completely false – a ruse and a trick designed, first, to get other unsecured creditors to make loans to the companies for Huff's benefit, and second, to declare an Event of Default, so that Huff could gain exclusive ownership of Noram's and Ausam's interest in the Properties.

**Huff falsely assures Ausam and Noram that Huff will approve the equity placement, and waive any right it may have to declare the placement an Event of Default under the Debenture**

26.     When Noram and Ausam approached Huff about its interpretation of the Debenture's covenants, Huff saw its opportunity to lure Noram and Ausam away from alternative sources of financing, and to also lure these companies into circumstances where Huff could declare an Event of Default. Huff could then move closer to its goal of creating liquidity problems for the companies, forcing Ausam and Noram into insolvency, and foreclosing its lien on the Properties, or otherwise using its secured position to gain Noram's and Ausam's interests in the Properties for its exclusive use.

27.     To implement this "string-along" plan, authorized representatives of The Huff Energy Fund L.P. repeatedly assured Noram and Ausam that Huff would approve of Ausam's planned financings, *e.g.*, the private placement of equity and debt, and waive any right to declare that an Event of Default under the Debenture had been caused by the capital raises. Some non-exclusive examples of these representatives' specific and knowingly false assurances follow:

- On a June 2008 afternoon, Ed Dartley, who was appointed by Huff to be Huff's observer of Ausam's and Noram's board of directors, spoke by telephone to Ausam CEO Mark Avery. At the time of this conversation, Dartley was in Huff's office at 67 Park Place, Morristown, NJ 07960, and Avery was in Noram's office at 13103 FM 1960 West, Suite 210, Houston, Texas 77065. Dartley then told Avery that Ausam and Noram could "take our [*i.e.* Huff's] non-response as an approval" by Huff of the planned private equity financing, and a waiver of any right under the Debenture to assert that the equity placement constituted an Event of Default. (Alternatively, Dartley employed words to this same meaning and effect).

- On or about October 7, 2008, Huff senior partner Bryan Bloom participated by telephone in a morning meeting of the board of Ausam. At the time of this board meeting, Bloom was in the Huff office at 67 Park Place, Morristown, NJ 07960. Avery and Ausam board members Richard Lummis and William Hitchcock were present at Ausam's offices at 13103 FM 1960 West, Suite 210, Houston, Texas 77065 at the time and they also participated in the meeting. Ausam board members Robert Eriksson, Alastair Robertson and Barry Borak also participated in the Board meeting by telephone. On information and belief, Ausam asserts that its transactional lawyer, Michael Der, of the firm of

Bennett Jones, 4500 Bankers Hall East, 855 2nd St. S.W., Calgary, Alberta T2P 4K7, also listened to the board meeting by telephone. At this meeting, Bloom orally advised Avery and other Ausam personnel that Huff would act as a "friendly banker" to Ausam and Noram. Bloom further advised that Ausam should submit a "waiver request" for the debt placement, equity private placement and early warrant exercise. Bloom stated that Ausam would be required to pay a nominal fee, Huff would approve of the planned financings, and then "we will carry on" business as usual because it was "in our [*i.e.* Huff's] interest that you [*i.e.* Ausam] succeed." (Alternatively, Bloom used words to this same meaning and effect.) Avery, Lummis, Hitchcock, Borak and others heard Bloom make these statements.

Huff understood that Ausam and Noram intended to and would be able to complete all the planned financings within approximately five to seven months of June, 2008. As understood by Ausam and Noram, Huff's promise to approve of the financings, and to waive any right to declare that an Event of Default under the Debenture had been caused by these capital raises, would be fulfilled when the financings were complete, and Huff had voiced no objection.

28.    Unfortunately, at the time Huff's principals, partners, directors or other authorized personnel gave assurances to Noram and Ausam that it approved of the financings and would waive any rights existing under the Debenture to construe the planned financings as an Events of Default, Huff and Borak both knew that the representations were false. Huff falsely stated both its then-existing state of mind and its future intentions. Huff did so because it and Borak wished to dissuade Noram and Ausam from pursuing other means of raising capital available to further the companies' business operations and develop oil and gas leases included in the Properties. Huff intended for Noram and Ausam to rely on its false representations, so that these companies would then proceed with the planned subordinated debt placement in coordination with an early exercise of warrants and simultaneous private equity placement, and forego other means of financing. Huff and Borak knew that Huff would later declare that the financings were Events of Default under the Debenture allowing acceleration of Noram's and Ausam's obligations to pay interest and principal under the Debenture. Huff could then complete its plan to force the

companies into insolvency and/or bankruptcy, so that Huff could use its lien to gain ownership of the companies' interest in the Properties, not only to the detriment of Ausam and Noram, but also to the detriment of these companies' other creditors.

29.     As a Huff principal and/or employee, Borak was "in on" and privy to Huff's plans. Borak was fully aware that Huff's assurances were false when made, and that Huff intended for Ausam to rely on the false representations. Despite his fiduciary obligations – including the duties of candor, good-faith, full-disclosure and loyalty to Ausam and Noram – Borak did not communicate the truth to the Debtors' estates. Instead, abandoning his duties to Ausam and Noram, Borak sought to use his position as an Ausam/Noram director to advance Huff's plan, expecting that if Huff succeeded in the scheme, Borak would benefit financially in his role as a principal and/or employee at Huff.

30.     In reliance upon Huff's knowingly false assurances, Ausam and Noram proceeded with the debt placement and equity private placement. Also, in reliance on Huff's false assurances – which Ausam board member William Hitchcock heard and which Ausam justifiably communicated to Mooney Enterprises LLC ("Mooney") – Hitchcock and Mooney each made $1,000,000 loans to Ausam on or about October 7, 2008. These loans were unsecured and subordinated to the Debenture. Prior to the time Hitchcock and Mooney made these $1,000,000 loans, Huff was aware of the terms for the loans, was aware that Hitchcock and Mooney would make the loans, and was aware that Hitchcock and Mooney were relying upon, *inter alia,* Huff's June and October 2008 false assurances in making the loans. Huff was also aware that Ausam would use the vast majority of the loan proceeds for Huff's benefit by funding a lease extension that protected Huff's collateral position in Noram's Iola Prospect. Further, Huff was also then fully aware that the loans were to be extinguished prior to year end 2008 through conversion into

the early exercise of warrants program, whereby the loan amount would be used to exercise warrants held by Hitchcock and Mooney.

31.     In October 2008, however, at the time Hitchcock and Mooney made these loans, Huff voiced absolutely no concerns.  Essentially, Huff and Borak sat back and watched as the two creditors made loans totaling $2 million to Ausam, knowing that after these loans were made, Huff would then seize upon the loans to argue that an Event of Default had occurred. Huff's declaring the Event of Default would then force Ausam and Noram into insolvency.  Huff also understood that declaring an Event of Default would cause Hitchcock and Mooney, as unsecured creditors, to lose the money they had loaned to the company.  Huff and Borak kept quiet, however.  Huff wanted Hitchcock and Mooney to make the loans to Ausam because it knew that Ausam would use the funds to protect Huff's interest.

32.     Noram's and Ausam's counsel at Bennett Jones found Huff's oral assurances so sufficient that counsel advised Noram and Ausam that Bennett Jones would release the funds raised with the private placement of equity for the companies' use, and that the companies could close on the private debt issue.

33.     As time would show, Huff's knowingly false assurances, and Borak's knowledge of, complicity in and failure to disclose same, had fooled Ausam, Noram, their board members and their creditors.  Huff and Borak fooled Ausam, Noram, their board members and unsecured creditors with the fraudulent representations described above and with numerous other misrepresentations – including negligent mis-representations and negligent failures to disclose when there was a duty to speak – that continued through late 2008.

> **After the debt and equity private placements had already issued, Huff conditions its promised approval of the financing and waiver of any right to declare an Event of Default on Ausam's and Noram's acceptance of onerous and pre-textual demands**

34.    Having strung Ausam and Noram along from no later than June 2008 through

November 2008, Huff now showed its true colors. Continuing a pattern of deceptive behavior,

Huff wrote to Ausam and Noram on or about November 28, 2008, declaring for the first time

that the on-going and completed financings were Events of Default under the Debenture. Huff

stated it would only waive Events of Default under the Debenture if Ausam and Noram

consented to the onerous and unachievable terms of a purported Forbearance Agreement that

Huff proposed. Incredibly, Huff's November 28 letter imposed a deadline of less than two

weeks for Noram and Ausam to comply with all the onerous conditions set out in the letter. [4]

35.    Among the demands by Huff for the Forbearance Agreement were requirements

that:

---

[4]    Consistent with Huff's prior conduct, the November 28, 2008 letter contains statements that were
demonstrably false. For example, the letter stated, that in February 2008, Huff first learned of significant
title defects for the oil and gas Properties that Ausam/Noram purchased from SKH which Ausam had
discovered beginning in mid-2007. The letter continued that such matters required immediate notification
to Huff under the terms of the Debenture. As Huff knew, however, SKH and Ausam/Noram had closed
on the purchase of these Properties with conveyances that began on or about January 27, 2007. Prior to
Ausam's/Noram's issuing the July 3, 2007 Debenture to Huff, Ausam and Noram allowed Huff complete
access to all due diligence Huff requested – including specifically the due diligence that Ausam/Noram
had performed before purchasing the SKH Properties. Ausam's and Noram's due diligence for these
Properties showed that approximately 90% of the acreage in the Properties had no title or lease issues or
defects, or like problems.

In February 2008, i.e., approximately seven (7) months after Huff had completed its due diligence
for the Debenture, Huff employee Richard D'Angelo participated in a telephone conference with Ausam
personnel including Mark Avery. At the time of this conversation, Avery was in Ausam's office at 13103
FM 1960 West, Suite 210, Houston, Texas 77065 and D'Angelo was in Huff's office at 67 Park Place,
Morristown, New Jersey 07960. In this conversation, Avery stated that Ausam understood that
approximately 90% of the acreage included in the SKH Properties had no title or lease issues or defects.
D'Angelo responded that Huff "found the same thing" as part of performing its 2007 due diligence in
deciding whether to lend the $25 million to Ausam and Noram.

In other words, Huff did not "first learn" of the title defects and issues in February 2008. Rather,
Huff admittedly was aware of these issues no later than July 3, 2007 – when Huff completed its due
diligence for the Debenture.

This awareness is simply one example of the pre-textual nature of Huff's November 28, 2008
letter.

- Noram and Ausam stipulate that they would never assert that Events of Default under the Debenture had not occurred;

- Noram and Ausam would close on at least another $2 million in equity financing through a warrant early exercise program;

- Noram and Ausam would escrow $300,000 of the $2 million equity raised as collateral for the Debenture;

- Ausam would pay Huff a consent fee of $150,000, and issue 300,000 warrants on the same terms as warrants earlier issued to William Hitchcock, chairman of Ausam, in connection with $1 million loan that Hitchcock made to Ausam;

- Noram and Ausam would use claims they purportedly possessed against SKH (which sold Noram the Properties per the APA) to renegotiate SKH's agreement with Noram and Ausam so as to extend Noram's time period to market and drill the prospects subject to reversion to SKH to a date no earlier than July 4, 2012; Ausam would then provide Huff with an executed agreement with SKH in a form acceptable to Huff no later than December 11, 2008; and

- By December 3, 2008, Noram and Ausam would amend the terms of Huff's existing warrants to purchase additional equity in Noram and Ausam to extend the expiration of such warrants to December 3, 2013 and to adjust the strike price to $0.1984 per warrant share.

36.     Provided that these and other conditions were met by December 11, 2008 – *i.e.*, less than two weeks later – Huff stated, the Forbearance Agreement would take effect. Huff and Borak knew at the time it proposed these onerous terms that Ausam and Noram could not accept them, both because the terms were impossible to achieve in such a short time and because the companies' management would recognize such terms were irresponsible toward the companies' welfare and toward the shareholders and/or other stakeholders. Huff and Borak knew at the time that it made the demands asserted in the letter that a prudently-managed, comparable company could not reasonably expect to satisfy such demands within the thirteen (13) day deadline set out in Huff's letter.

37.     Not content to demand pre-textual, impossible terms for the Forbearance Agreement, Huff's letter also specified that the proposed Agreement would only remain effective for so long as certain on-going conditions were met. These continuing conditions included:

- Ausam and Noram would agree to pay the full face amount of the $25,000,000 Debenture, plus all accrued but unpaid interest and all other amounts outstanding on May 15, 2009 (*i.e.,* approximately five (5) months later) – instead of on the original July 3, 2012 Maturity Date (three and a half years later) as contemplated in the Debenture – plus an appropriate pre-payment premium acceptable to Huff;

- Ausam would provide Huff with a budget for 2009, and would be prohibited from spending amounts in excess of the budget without Huff's prior written approval; and

- Ausam would grant Huff the right to speak with employees or other representatives of Ausam as Huff deemed advisable in connection with Ausam's business, operations and prospects.

38.     As with the other demands and conditions that Huff made, these on-going conditions were pre-textual. Huff and Borak never intended for Ausam and Noram to accept them. Rather, Huff and Borak intended for these on-going conditions to be so onerous as to assure that Ausam and Noram would reject the terms for the proposed Forbearance Agreement and provide "cover" for their illicit scheme.

39.     Huff and Borak also knew at the time that it sent the November 28, 2008 letter to Noram and Ausam that the conditions were commercially unreasonable for the companies. Huff's purpose in demanding that Noram and Ausam satisfy the on-going conditions set out in the November 28, 2008 letter was simply to appear as if Huff were making an effort to adhere to its prior commitments to Noram and Ausam to waive any objection to, and to approve, the planned financings by Ausam and Noram – only with a few "minor" adjustments.

40.     In reality, the demands and on-going conditions set out in Huff's November 28, 2008 letter were not minor adjustments to Bryan Bloom's October 2008 commitment to approve the planned financings, but simply require Noram and Ausam to pay a nominal fee or "penalty."

Rather, both the demands and on-going conditions were designed and calculated by Huff to cause their rejection by Noram and Ausam, so that Huff could then seize upon the companies' rejection as a basis declaring that the private equity and debt placements and the early warrant exercise program were indeed Events of Default under the Debenture.

41.     On December 3, 2008, Noram and Ausam responded to Huff's letter noting, among other things, that:

- Noram and Ausam had been attempting to address the issues in the Debenture for months during which time Huff assured Noram and Ausam that Huff was accepting of the actions that Ausam and Noram were taking.

- Huff's board member representative on Ausam's board and one or more observers were present at Board meetings when the actions were discussed and the plans for Ausam's future were approved.

- Huff was fully aware of the loan complained of in Huff's November 28, 2008 letter (as well as another loan to the companies), and did not object to such loans because the funds from the loans were used to protect a collateral position held by Huff.  Further, Ausam/Noram noted that Ausam would never have been able to obtain an advance of $2,000,000 from William Hitchcock and a company controlled by Stephen Mooney without Huff's representatives providing assurance to them that such advance would be consented by Huff.  As Huff was aware, 80% of the monies provided by such an advance went to protect Huff collateral in the Iola Prospect.

- Huff was imposing unreasonable and unrealistic conditions in a forbearance agreement.

- The conditions relating to Huff's forbearance were not practical because the terms put Noram and Ausam at risk of foreclosure regardless of compliance to the conditions of the proposed agreement.  These terms made it certain that Noram and Ausam would be in breach of one or more of such conditions if they went forward on the basis proposed by Huff.

42.     In summarizing Noram's and Ausam's concerns with Huff's November 28, 2008 demands and conditions, the companies noted that while they could agree to and attempt to cooperate with some of the demands and conditions, the companies could not "enter into agreements which are not practical ... and which unduly restrict Ausam's ability to operate ... ." Noram and Ausam offered in their response to meet with Huff to resolve differences in a way

that would allow Huff to observe its prior commitment to approve the planned private equity placement and waive any Events of Default.

43.     Huff representatives met with Noram and Ausam personnel Mark Avery and Richard Lummis at Huff's New Jersey offices on or about December 9, 2008, and Huff advised the companies that a letter proposing a settlement of the parties' differences would arrive within two (2) weeks.

44.     The promised letter arrived on or about December 15, 2008, and starkly revealed what had been Huff's and Borak's true purpose all along – getting Ausam's/Noram's Properties for Huff. Huff's December 15 letter demanded that Ausam and Noram deed the most lucrative and promising of the Properties directly to Huff. Ausam and Noram, Huff proposed, would be left with the least promising of the Properties, but with Huff retaining its security interest in those lesser Properties and essentially taking the right to the vast majority of any profits Ausam/Noram earned from these lesser Properties. Huff knew which of the Properties were the most lucrative because Borak, while ostensibly serving as a director of Ausam/Noram and participating in the companies' management in that capacity, learned which Properties were most valuable and relayed that information to his principal and employer Huff. As a publicly traded company, Ausam could not accept Huff's proposal, given the plainly detrimental effect it would have on that company, Noram and the shareholders.

45.     Huff and Borak knew that Huff's deceptions and recalcitrance would impede Ausam's and Noram's planned warrant early exercise program because warrant-holders would suspect that Huff was intentionally seeking to impose unreasonable and unrealistic conditions on Ausam and Noram through the proposed forbearance agreement. And in fact, Huff's misrepresentations and Borak's failures to disclose made execution of this program impossible.

Otherwise, Ausam and Noram would have been able to raise approximately US $2,000,000 and ultimately raise approximately US $3,500,000 from this program. Huff's and Borak's misconduct cost Ausam and Noram additional opportunities to raise capital and to pursue acquisitions, and damaged Ausam and Noram.

**Huff's misrepresentations and Borak's failures to disclose have the intended effect – confronted with Huff's impending acceleration of the Debenture, and anticipating the resulting liquidity crisis, Noram and Ausam file for Chapter 11 protection.**

46.     Confronted with the fact that Huff had reneged on its oral commitments, and had declared an Event of Default under the Debenture to accelerate the companies' indebtedness and foreclose on the oil and gas leases included in the Properties, Ausam and Noram faced the potential liquidity crisis that Huff had sought all along to create. From December 26 to December 30, 2008, Huff and Ausam/Noram engaged in discussions purportedly directed to addressing Huff's demands. Huff's participation in these discussions was again pre-textual; Huff had no intent of negotiating, proposing or agreeing to any settlement. In fact, as of December 30, 2008 – after Ausam/Noram had agreed to a range of Huff demands, Huff refused to even define the remaining Huff demands that Ausam/Noram should address. Ausam's board then realized that, with no preliminary terms for a settlement with Huff as of December 30, 2008, Ausam and Noram should file for Chapter 11 protection. The companies were therefore forced to file voluntary Chapter 11 cases on or about December 30, 2008.

47.     On the petition date, the Debtors owed Huff approximately $28,563,651 under the Debenture. As noted, this indebtedness was secured by a lien on the oil and gas leases comprising the Properties. The misrepresentations that Huff perpetrated on Ausam and Noram, combined with this lien, allowed Huff to achieve the goal Huff had contemplated all along – foreclosing on the Properties or, alternatively, gaining exclusive ownership of Noram's interest

in the Properties to the detriment of Debtors, their equity holders, and the Debtors' other creditors. On April 14, 2009, the Trustee filed a Motion to Sell substantially all operating assets of Ausam and Noram, including the oil and gas leases comprising the Properties, to Huff. *See* Doc. 92. Huff "credit bid" $12,500,000 of its secured claim, plus $200,000 cash for these assets. On May 11, 2009, the court entered an order granting the Motion to Sell. *See* Doc. 112. As part of this sale, Huff also took possession of paper and electronic records of Ausam and Noram.

48.     Huff completed the "asset grab" it had been plotting for months. Had Huff not perpetrated its fraudulent scheme on Ausam and Noram, these companies would have remained on-going businesses. Ausam and Noram would have been able to timely pay their secured creditor and the unsecured creditors Hitchcock and Mooney (who would have converted their debt to equity through the early exercise of warrants), as well as providing a reasonable return on investment to Noram's and Ausam's equity holders.

### Huff continues its wrongful conduct post-petition, harming the Debtors' estates

49.     To Huff's dismay, the plan was not without problems. SKH appeared in the bankruptcy case and asserted that certain interests in the oil and gas leases had reverted to it and that *SKH* – not Huff – was now the owner of valuable interests in those Properties. On learning of SHK's assertions, Huff proceeded to violate fiduciary duties to the bankruptcy estates of Ausam and Noram in at least two ways.

50.     First -- separate and apart from any disputes that the Debtor's estates may have had with SKH -- Huff already had *its own*, pre-existing lawsuit against SKH. Specifically, on May 4, 2009, SKH filed a suit against Huff, styled in *SKH Management, L.P. v. The Huff Energy Fund, L.P.*, Adv. No. 09-3165, seeking a declaration that the sale referenced in paragraph 47 was subject to the terms and conditions set out in the APA between Ausam and SKH. SKH asserted

*inter alia* that Huff could only take the oil and gas Properties conveyed as a result of the Court's Sale Order, *see* Doc. 112, subject to, *e.g.*, SKH's (1) undivided 25% after-Payout interest in certain leases and assets as defined in the APA, (2) reversionary rights to a 25% interest in certain leases as defined in the APA, and (3) reversionary rights to 100% of all leases where no drilling had commenced by December 31, 2009 for a test well as defined in the APA. *See, e.g.*, No. 09-03165, Doc. 38 at 4-5.

51.     In other words, SKH asserted that, despite the May 11, 2009 Sale Order, SKH – not Huff – owned a significant and valuable portion of the oil and gas Properties that Huff thought it had acquired free and clear out of the Debtors' estates. *See* No. 08-38222, Doc. 112. SKH also asserted in its action that Huff had disregarded, and would continue to disregard, SKH's ownership of these interests in the Properties. Huff answered and counterclaimed, asserting, *inter alia,* that the APA was an executory contract rejected by the Trustee, that SKH's claims to the leases and assets were contingent and not vested, that the SKH's interests in the leases and assets failed under the Statute of Frauds and the Rule against Perpetuities, that the Trustee had stripped the leases of any interests held by SKH under section 363(f) and that Huff took those interests free and clear, and that SKH did not and could not own any interests in these Properties for other reasons. *See, e.g.*, No. 09-03165, Docs. 11, 43.

52.     At bottom, SKH wanted to establish by filing *SKH Management, L.P. v. The Huff Energy Fund, L.P.*, Adv. No. 09-3165, that it retained valuable ownership interests in the Properties despite the Sale Order. *See* No. 09-03165, Doc. 38, at 4-5. Huff strongly disagreed, and wanted to establish that Huff took these Properties free and clear of any interests in favor of SKH. *See* No. 09-03165, Doc. 11, at 10-13.

53.     In the May/June time frame of 2009, Huff began to perceive that it could gain an advantage in its ongoing lawsuit with SKH, Adv. No. 09-03165, if – on behalf of the Trustee – Huff were also in command of any claims that the Debtor's estates might have against SKH. Accordingly, Huff sought and received from the Court authority to assert causes of action against SKH on behalf of the Debtors' estates. *See* Doc. 145. On July 28, 2009, Huff filed with the Court a motion seeking authority to pursue claims against SKH as an agent of the Ausam and Noram bankruptcy estates. At the direction and request of Huff personnel including Bryan Bloom and Ed Dartley, Huff outside counsel Timothy Davidson and Hugh Ray, 600 Travis, Suite 4200, Houston, Texas 77002, represented to the Trustee and Court in this motion:

- "The Trustee has consented to Huff's filing and prosecuting the [estates'] Claims against SKH ... . [T]he Trustee has requested ... that any recoveries on the Claims will be received by the Trustee on behalf of the estates. The Trustee has requested <u>and Huff agrees</u> that any settlement offers will be conveyed to the Trustee and that the <u>Trustee will receive periodic reports from Huff of the status of the investigation</u> and <u>prosecution of the</u> [estates'] <u>Claims</u>." No. 08-38222, Doc. 137, at 6-7 (emphasis added).

- "Huff has conducted its own legal analysis of [SKH's] breaches of representations and warranties and <u>will share the same with the Court <em>in camera</em></u> ... ." *Id.* at 6 n.2 (emphasis added).

- "Huff and its counsel have performed an <u>extensive and ongoing review of the</u> [estates'] <u>Claims</u>." *Id.* at 8 (emphasis added).

- "Huff's ... prosecution of the Claims is <u>in the best interest of the Debtor's estates</u> because <u>Huff has identified significant value</u> that may yield <u>substantial recovery</u> for the ... estates ... and the estates have no resources to pursue the Claims." *Id.* at 7 (emphasis added).

- "<u>Significant value that should be recovered by the estates could be lost</u> if Huff is not authorized to ... prosecute the [estate's] Claims." *Id.* (emphasis added).

54.     In other words, in its July 28, 2009 motion filed with the Court and in contemporaneous communications to the Trustee West, Huff and its counsel stated that (1) Huff had conducted its own investigation and analysis of the Ausam/Noram bankruptcy estate's

claims against SKH, (2) Huff would share that analysis with the Court, (3) Huff had found *significant value* in the estates' claims against SKH, but (4) the Debtors' estates lacked the resources to pursue the claims against SKH, so that (5) Huff should be allowed to bring the claims for the estates, and (6) Huff had agreed to provide periodic reports to the Trustee on the status of the investigation into and prosecution of the estates.  In addition to making these representations in its filing with the Court, Huff agents and attorneys Davidson and/or Ray, acting at the behest of Mssrs. Bloom and Dartley, made the same or equivalent representations orally in a conversation with David Jones, as counsel to the Trustee, on or about July 27, 2009, while Jones was in his office in his office at 1000 Main St., 36th Floor, Houston, Texas 77002. Huff thereby persuaded the Trustee to consent to Huff's pursuit of SKH on claims held by the estates.

55.    At the time Huff made these representations, however, Huff had no intention of bringing the Debtors' estates' claims against SKH in a manner that would truly benefit the Debtors' estates.  Rather, Huff's intent was to get itself appointed to represent the estates, and then to use its status as Trustee's litigation counsel in a way that would benefit Huff in Huff's own dispute with SKH.

56.    On December 28, 2009, the Court granted Huff's motion for authority to assert causes of action on behalf of the Debtor's estates. No. 08-38222, Doc. 145. The Order divested the Trustee of the conduct of the litigation by giving Huff "exclusive authority to make all ... decisions concerning" the claims that Huff would bring on behalf of the estates of Ausam and Noram "provided, however, that Huff will provide any settlement offers and periodic status updates to the Chapter 7 Trustee." *Id.* at 1-2 (emphasis original).

57.     Huff thus became an agent and fiduciary of the Ausam and Noram bankruptcy estates no later than the Court's granting of Huff's motion, if not before.

58.     As an agent of the estates, Huff was a fiduciary obligated to suborn its own interest to those of Debtors' estates. Huff's duties to the estates included the duties of candor, transparency, scrupulous honesty and good faith, and unselfishness. The fiduciary duty that Huff undertook to the Debtors' estates also included a duty of full disclosure respecting all matters affecting or touching on the estates' interests, and a prohibition against Huff using its agency relationship with the estates to Huff's benefit. Huff's fiduciary duties likewise included an obligation not to place itself in a position where Huff's self-interests might conflict with its obligations as a fiduciary, not to compete with the Debtors' estates on its own account in matters relating to the subject matter Huff's employment by the Trustee, and not to use Huff's employment by the Debtors' estates to gain an opportunity belonging to the estates. Moreover, because Huff held itself out as specially qualified and fit to pursue the estates' claims against SKH (due to Huff's own analysis, review and investigation of those claims, which Huff committed to sharing with the Court), the Trustee was warranted in fully relying on Huff's assurances, judgment and integrity when Huff made communications to the Trustee about the estates' claims against SKH.

59.     But at the time that Huff caused its counsel to make the above statements in its July 28 motion, and to make like contemporaneous statements to the Trustee, Huff had knowledge of the statements' falsity, or made the statements recklessly without knowledge of their truth and as a positive assertion. Alternatively, the Trustee alleges, Huff made these statements negligently. Huff made these statements with the intent that the Trustee would rely on them, and the Trustee did rely on them.

60.    In actuality, when Huff made these statements, it had no intent of getting "significant value" or "substantial recovery" for the estates on their claims against SKH. As noted, Huff simply wanted to be in the driver's seat on the estates' claims to give Huff added leverage over SKH in Huff's own dispute that company in *SKH Management, L.P. v. The Huff Energy Fund, L.P.*, Adv. No. 09-3165.

61.    Further, prior to the time that the Court actually granted Huff's motion for authority to assert claims against SKH on behalf of Debtor's estates, Huff was confident that its motion would be granted. Among other things, the Trustee – being fooled into believing that Huff was a faithful fiduciary, which truly wanted to get recovery on those claims for the benefit of the estates, and also seeing little other practical means of pursuing the estates' claims against SKH – had consented to Huff's pursuit of those claims. *See* No. 08-38222, Doc. 137 at 6. The estates lacked the financial means to bring claims against SKH themselves, and no other party besides Huff had offered to press the claims for the estates.

62.    Given that Huff already was engaged in that lawsuit with SKH concerning ownership in the Properties, Huff seized its chance to use the authority to represent the estates to Huff's own advantage in *SKH Management LP v. The Huff Energy Fund LP*, Adv. No. 09-03165. When cloaked and/or about to be cloaked in its authority to act for the Trustee – Huff communicated to SKH that Huff had the ability to, and would, use its authority to investigate, analyze and pursue the estates' claims against SKH to SKH's detriment – unless SKH agreed to concessions on the positions that SKH had taken in No. 09-03165.

63.    Huff's plan worked. Huff and SKH agreed to a settlement of SKH's claims and Huff's counterclaims in No. 09-03165 in January 2010 – with SKH making material concessions in that settlement agreement versus the positions that SKH had previously asserted, *e.g.*, in

Complaints that SKH filed in that action. SKH also made concessions that SKH would not have made had Huff not used its status as Trustee's litigation counsel to gain added leverage over SKH in Adv. No. 09-03165. Huff thus used its authority to represent the estates as leverage against SKH to obtain for *itself* an improper benefit from representing its principal, the Debtors' estates. Huff breached its fiduciary duty to the estates by using it status as the estates agent to benefit – not the Debtors' estates – but Huff instead. Huff inverted and violated an agent's duties by suborning its principal's interests to its own interests.

64.      Acting on Huff's direction, Huff's attorney Timothy Davidson then filed in this Court an agreed order to dismiss with prejudice all claims and counterclaims asserted by the parties in *SKH Management LP v. The Huff Energy Fund LP*, No. 09-03165 on February 3, 2010. *See* No. 09-03165, Doc. 52. The Court granted the agreed motion on February 24, 2010. No. 09-03165, Doc. 53.

65.      On or about March 4, 2010, David Jones, acting as counsel to the Trustee, spoke by telephone with Timothy Davidson, Huff's counsel. At the time of this call, Mr. Jones was in his office at 1000 Main St., 36th Floor, Houston, Texas, 77002 and Mr. Davidson was in his office at 600 Travis, Suite 4200, Houston, Texas 77002. Among other things, Mr. Jones inquired as to the status of Huff's pursuit of claims against SKH for the estates. Mr. Davidson told Mr. Jones that Huff had resolved its own claims against SKH, and that Huff was not going to do anything with the Trustee's claims against SKH.

66.      Having used its authority to bring the Debtors' estates' claims against SKH to achieve a benefit for itself in No. 09-03165 (*i.e.*, material concessions from SKH on the positions that SKH would otherwise have taken), Huff then reneged on its express agreement to provide "periodic reports ... of the status of the investigation and prosecution of the [estates'] Claims." Also,

having told the Court and the Trustee on, *e.g.*, July 28, 2009, that Huff had conducted its "own legal analysis" of the estates' claims against SKH, and its own "extensive and ongoing review" of those claims, and had thereby "identified significant value that may yield substantial recovery" for the estates, Huff's attorney Timothy Davidson, acting at Huff's direction, on April 1, 2010 wrote the Trustee's attorney David Jones, 1000 Main Street, 36th Floor Houston, Texas 77002. In a one-sentence letter headed in bold, **"Notice of Election Not to Prosecute Estate Claims Against SKH,"** Huff's agent stated, "Please take notice that pursuant to paragraph 2 of the Order Granting The Huff Energy Fund LP's Motion for Authority to Assert Causes of Action on Behalf of the Debtors Estates [Docket No. 145] Huff has decided not to further investigate, commence or prosecute the Claims against SKH." (Brackets original). Despite its earlier glowing statements to the Court and Trustee regarding the "significant value" and "substantial recovery" to the Debtors' estates on the SKH claims, Huff simply dropped those claims without any explanation and without sharing any analyses or results of its alleged investigation(s) into SKH claims with the Trustee.

67.     Despite its earlier agreement to provide "periodic reports" to the Trustee on the status of its investigation and prosecution of the claims, Huff never provided such periodic status reports to the Trustee or David Jones. Huff never shared the results of its "extensive and ongoing review" of the SKH claims with the Trustee. Huff never communicated any settlement overtures from SKH on the Debtors' estates' claims against SKH. To the Trustee's knowledge, Huff never provided the Court with an *in camera* review of its analysis of the estates' claims against SKH. Huff's fraudulent and/or negligent intent can also be inferred from the fact that Huff never did, or attempted to do, the things that Huff specifically stated that it would do.

68.    At bottom, Huff never intended to pursue the Debtors' estates' claims against SKH in the manner that a faithful fiduciary would. From the beginning, Huff's intent was rather to enhance its own bargaining position versus SKH in Adv. No. 09-03165.

69.    Huff also violated its fiduciary duties to the Debtors' estates in a second way. Huff was the Debtors' estates' agent and had duties of full disclosure, candor and transparency to the Trustee on all matters affecting or touching on the estates' interests. These duties continued after April 2010. If Huff's conduct toward the estates had been innocent, then Huff would have scrupulously observed these duties, and Huff would have no objection to sharing with the Trustee information that the estates have specifically requested.

70.    But Huff has refused to do so. As set out below, Huff's breaches of these duties -- especially Huff's failures to make required disclosures when specifically requested to do so by the Trustee[5] — constitute entirely separate and distinct breaches of Huff's fiduciary duty, and serve only to inculpate Huff further on the breaches of fiduciary duty set out above.

71.    On or about December 14, 2010, Trustee's counsel John Strawn and Andy Pickens visited Huff's office at 67 Park Place, Morristown, NJ 07960 for the purpose of examining documents in Huff's possession as a result of the Sale Order. While at Huff's office, Messrs. Strawn and Pickens met with Huff in-house counsel Ed Dartley to discuss matters relating to those documents. At this meeting, Mr. Strawn, as counsel to the Trustee, requested that he be allowed to review the settlement agreement executed by Huff and SKH which resolved the claims brought by the parties in Adv. No. 09-03165. Despite the fact that this settlement agreement touched upon and affected the estates' business, Huff, through Mr. Dartley, refused to allow Mr. Strawn to see this settlement agreement. This is but once instance of Huff

---

[5]  Huff's duties of candor, transparency and full disclosure exist by reason of Huff's agency relationship with the estates, and are independent of any discovery obligations that may be imposed on Huff in this action under, *e.g.*, Fed. R. Civ. P. 34.

violating its duties of full disclosure, transparency and candor to the estates on matters affecting the estates' interest.

72.     Huff later retained Patton Boggs to represent it on claims in this action. On or about June 28, 2011, counsel for the Trustee Andy Pickens wrote Robert Jones at Patton Boggs' office, 2000 McKinney, Suite 1700, Dallas, Texas 75201. Mr. Pickens explained that, pursuant to Huff's agency duties of candor, transparency and full disclosure to the estates under the agreements and assurances made by Huff in the motion for authority to assert causes of action on behalf of the Debtor's estates, the Trustee requested that Huff provide the Trustee with, *e.g.*, the following information:

- Any and all work product, analyses or reports on the status of investigations that Huff or its attorneys created after December 28, 2009 (the date of the Court's Order authorizing Huff to pursue the estates' claims against SKH), referring to, relating to or showing in any way Huff's reasons for determining that the pursuit of claims against SKH on behalf of the Debtor's Estates was no longer worthwhile, whether from Huff's perspective or the perspective of the Estates;

- Any communications or documents, including but not limited to letters, faxes, emails, memoranda or like documents, made between Huff and SKH after December 28, 2009, which refer to, relate to or show in any Huff's pursuit of "the Claims" as defined in Motion for Authority to Assert Causes of Action on Behalf of the Debtors' Estates, *see* Doc. 137, at 4; and

- Any agreement, contract or other understanding between SKH and Huff relating to or in any way showing terms for resolution and/or dismissal of the claims and/or counter-claims brought in *SKH Management, L.P., et al v. Huff Energy Fund LP and W.H. Ave., LLC,* Adversary No. 09-03165, (Bankruptcy case No. 08-38222), U.S. Bankruptcy Court Southern District of Texas.[6]

73.     These items were carefully defined to seek information that Huff can have no principled reason for refusing to disclose to the Trustee. The first two of these items indisputably would have been created *only after* the Court's December 28, 2009 Order, *see* No. 08-38222, made Huff the estates' *agent and fiduciary* for purposes of pursuing the SKH claims. Huff has no excuse

---

[6] The Trustee does not concede or suggest that the information relevant to the estates' claims is limited to the requests set out in this letter.

for not providing these materials to the Trustee. As to the last of these items, the Trustee stated his
willingness to enter into a confidentiality agreement of the type customarily used in the Bankruptcy
Courts for the Southern District of Texas for the protection of any proprietary business information.

74.      Acting as Huff's agent, Mr. Jones sent a letter to Mr. Pickens at 1001 Fannin, Suite
4665, Houston, Texas about three and a half weeks later, on July 21, 2011. This letter did not
address or respond to the Trustee's requests for information that the Trustee was and is plainly
entitled to receive. Though courteous and wholly professional in nature, the letter essentially stated
that, if the Trustee perceived value in the estates' claims against SKH, the Trustee should himself
retain contingent fee counsel to pursue the claims against SKH for the estates.[7]

75.      On or about July 29, 2011, acting as counsel to the Trustee, Mr. Pickens again
wrote Mr. Jones at Patton Boggs' Dallas address with a demand that Huff disclose to the estates
the materials described in his June 28 letter. To date, Huff has completely refused to respond.
Huff's conduct in refusing to produce to the Trustee these carefully defined materials – despite at
least three (3) separate, specific requests from the Trustee that Huff do so – are independent
breaches of fiduciary duty. Huff's refusals are also damaging the estates by preventing the
Trustee from developing the estates' claims in a cost-effective manner.

---

[7]  Among other things, the July 21, 2011 letter stated, "The Trustee's failure to prosecute claims against
SKH demonstrates either that the Trustee has been negligent in his failure to pursue valid estate claims, or
that the Trustee attributes no value to those claims. ... [T]he Trustee should immediately dismiss claims in
the Adversary against Huff related to SKH ... . We reserve all rights."
This statement evinces some misapprehension of the Trustee's breach of fiduciary duty claim against
Huff. Having had no access to formal discovery, and reserving any further rights to amend, the Trustee
notes that monetary damage to the estates from SKH's actions is not a pre-requisite to the Trustee's
breach of fiduciary duty claim. Rather, the Trustee may recover on this claim where it shows a breach of
fiduciary duty and an *improper benefit* flowing to Huff as a result of that breach. Here, Huff obtained that
improper benefit by, *e.g.*, suborning the estates interests to its own, and using it status as agent of the
estates on claims against SKH solely to obtain concessions from SKH in settling *SKH Management, L.P.
v. The Huff Energy Fund, L.P.*, Adv. No. 09-3165.
This is not to say the estates cannot show damages; they can – *e.g.*, Huff's failure to negotiate with SKH
for the reduction or elimination of SKH's claims in Ausam's bankruptcy. However, monetary damages
are not essential to the estates' claim against Huff.

76.     More than one year has passed since the Trustee requested that counsel be allowed to review the settlement agreement between Huff and SKH. More than six months have passed since the Trustee requested that Huff disclose to him the materials described in Mr. Pickens June 26, 2011 letter. Huff's fiduciary obligations as agent of the estates to produce these materials is independent of any discovery obligations imposed by the Rules of Civil Procedure. Yet Huff persists in its refusal to disclose these materials to the Trustee, despite the Trustee's willingness to enter appropriate confidentiality agreements.

77.     As noted, were Huff's conduct in connection with the estates' claims against SKH innocent, then Huff would not hesitate to disclose the requested materials to the Trustee. As the estates' agent, Huff also breached its fiduciary duty by failing and refusing to provide the Trustee all material facts relating to, affecting or touching the subject matter of its agency.

## Causes of Action

### Breach of fiduciary duty and unjust enrichment – Huff

78.     As set out above, Huff agreed to investigate and pursue, on behalf of the estates, claims against SKH. Huff was a fiduciary to the estates and owed a duty to the estates to act in their best interests, as also owed the estates the duties of candor, transparency and full disclosure of all material facts relating to, affecting or touching on the subject matter of its agency. Huff breached this duty. Among other things, Huff used its authority to act on behalf of the estates to negotiate a settlement or other agreement between SKH *and Huff*. This settlement benefitted – not Debtors' estates – but Huff instead. Huff then inaccurately and/or with an improper, self-interested purpose, advised the Trustee that Huff had determined that any estate claims against Huff were not worth Huff's pursuit. Huff made this statement without fulfilling the duties it had committed to undertake in its Motion for Authority to Assert Causes of Action on behalf of the

Debtors' Estates. *See* No. 08-3822, Doc. 137. Huff also failed and refused to provide the estates with material facts and information relating to, affecting or touching on the subject matter of its agency for the estates. In fact, Huff did so despite the Trustee's express requests that Huff make the required disclosures. The Debtors' estates were injured and damaged because they lost the benefits that a faithful fiduciary and agent could have achieved in asserting claims against SKH on behalf of the Trustee and the estates. The estates have also been damaged by Huff's non-disclosures because they have harmed the estates' ability to develop claims in this action in a cost-effective manner. Alternatively, Huff suborned the estates' interests to its own by using its status as agent of the Trustee – not to recover for the estates – but to extract concessions and benefits from SKH in Adv. No. 09-03165. The benefit realized by Huff in breaching its duty to the estates should be disgorged and given to the Debtors' bankruptcy estates. Moreover, Huff's being retained to represent the estates on the claims against SKH conferred a benefit on Huff, including SKH's concessions on positions SKH took in Adv. No. 09-03165. Huff had knowledge and appreciation of this benefit. Huff accepted this benefit under circumstances that make it inequitable for Huff to retain the benefit without compensation to the estates for its value. Further, Huff obtained a benefit from being retained to represent the estates on the SKH claims by fraud, duress or undue advantage.

### Breach of fiduciary duty/duty of loyalty and breach of duty of care—Borak

79.     As a director, Borak owed Ausam/Noram the fiduciary duty to act honestly and in good faith with a view toward the best interests of these companies. Borak breached these duties. Borak was aware of Huff's scheme to dissuade Ausam/Noram from seeking alternative sources of financing by assuring Ausam that Huff would not construe the planned debt and equity capital raises and early warrant exercise program as Events of Default under the

Debenture, so that Ausam would proceed with these financings. Because he was a principal and/or employee at Huff at the relevant times, Borak was privy to Huff's true intentions, and Borak knew that the Huff representations detailed above were false when made, that Huff knew they were false, and that Huff intended for Ausam to rely upon Huff's false representations. As a principal and/or employee at Huff, Borak was fully aware that, once Ausam/Noram proceeded with the capital raises, Huff planned to declare that such financings were Events of Default under the Debenture, and to seize upon these purported defaults as a pretext for accelerating, and demanding as immediately due and payable, the principal and interest owed under the Debenture. As a principal and/or employee at Huff, Borak was also aware that Huff intended to use the declarations of default to foreclose on the lien, or otherwise use its position as a secured creditor to gain exclusive ownership and control of the Properties to the detriment of Ausam, Noram, and these companies' other creditors and equity holders.

80.     In violation of his fiduciary duty and duty of loyalty, including duties of honesty, good faith and disclosure/candor to Ausam/Noram, Borak did not disclose Huff's true intentions to Ausam, even though Borak was fully aware of those intentions and had a duty to speak. Borak subordinated his fiduciary duties to the interests of Huff and to his personal interests. Borak kept quiet because Borak intended for Huff to profit at Ausam's and Noram's expense. Borak expected to profit individually and personally in his capacity as a principal and/or employee at Huff by Huff's gaining ownership and control of the Properties to the exclusion and detriment of Ausam, Noram, these companies' other creditors, and equity holders. Borak expected that, once Huff completed its scheme, Huff would share the benefits of Huff's ill-gotten gains with Borak individually.

81.     Ausam and Noram were damaged as described above by Borak's breaches of fiduciary duty, including Borak's failures to disclose, in an amount of at least $31 million. Alternatively, as alleged above, Borak failed to act prudently and on a reasonably informed basis, and made poor and ill-considered business decisions as a director which cannot be defended under the business judgment rule.  Though Borak was aware from communications with Huff personnel that Huff did not intend to waive Events of Default allegedly caused by the debt and equity raises, and the early warrant exercise program, Borak negligently failed to communicate that intention to Ausam and Noram.  Borak's ill-considered and/or negligent decisions included failing to advise Ausam and Noram of Huff's intentions when there was a duty to do so.

### Civil conspiracy, principal-agent vicarious liability

82.     Huff and Borak are separate persons or entities who decided on an object to be accomplished – namely, deceiving Ausam/Noram into believing that Huff would not assert that the debt and equity financings and warrant early exercise program constituted Events of Default under the Debenture.  Huff and Borak, in his capacity as a director of Ausam and/or Noram, had a meeting of the minds as to their course of action.  Huff and Borak understood that Huff would make false statements to Ausam/Noram, with the intent that Ausam/Noram rely on Huff's false statements, and that Borak, in disregard of his fiduciary duties to Noram/Ausam and with full awareness that Huff made the false statements knowingly, would not disclose such falsity to Ausam and/or Noram.  Huff, in fact, knowingly made multiple false statements to Ausam and Noram.  Borak knew that Huff's statements were false at the time that Huff made them to Ausam/Noram, and knew that Huff intended for Ausam/Noram to rely on the falsehoods.  But, acting as Huff's agent instead of as Ausam's and Noram's fiduciary, Borak did not advise

Ausam and Noram that Huff's statements were false, whether at the time made or at any later time sufficient to permit Ausam and Noram to avoid Huff's scheme. Huff and Borak thereby combined to damage Ausam and Noram.

83.     Huff as conspirator and principal is vicariously liable for the wrongful acts of its co-conspirator and agent Borak.

### Request for Pre- and Post-Judgment Interest and Attorney's Fees

84.     The Trustee seeks pre-judgment interest at the rate of 5% per annum. The Trustee seeks post-judgment interest on all money damages awarded hereunder from the date of judgment until paid at the prevailing federal judgment rate. The Trustee also requests an award of his reasonable attorney's fees to the extent allowed by law.

### Request for Exemplary Damages

85.     The abrogation of his duties by Borak and the actions of Huff were intentional and malicious and intended to cause harm to the Debtors' estates. The Trustee seeks the award of exemplary damages against the defendants in an amount of not less than three times the amount of monetary damages awarded and the value of all property wrongfully obtained by Huff.

### Prayer for Relief

For these reasons, the Trustee asks that the Debtors' estates recover a judgment against Huff and Borak awarding the following relief:

a.     Equitable subordination of Huff's claims, including claims as a secured creditor, in the Noram and Ausam bankruptcy case and/or the assignment of all liens to the estate;

b.     An award of actual damages against Huff and/or Borak;

c.     Exemplary damages;

d.     Compensation for, or restitution and/or disgorgement of, any benefit received by Huff from SKH in connection with Huff's representation of the estates on claims against SKH;

e.     An award of fees and expenses associated with this action, including but not limited to reasonable attorneys' fees incurred and as allowed by law or in equity; and/or

f.     An award of interest and all costs incurred in connection with this matter.

Respectfully submitted,

STRAWN PICKENS L.L.P.

By:          /s/ John R. Strawn, Jr.
             John R. Strawn, Jr., #19374100
             Andrew L. Pickens, #15971900
             Pennzoil Place, South Tower
             711 Louisiana, Suite 1850
             Houston, Texas 77001
             (713) 659-9600
             (713) 659-9601 (Fax)

**ATTORNEYS FOR TRUSTEE WILLIAM G. WEST**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all interested parties on this the 17th day of February 2012.

               /s/ John R. Strawn, Jr.
               John R. Strawn, Jr.